PER CURIAM.
This is an appeal from a decision by the Civil Service Commission upholding the plaintiff’s dismissal from the New Orleans Police Department.
The plaintiff was a police officer assigned to the Family Services Division of the New Orleans Police Department. He had been with the New Orleans police force for eleven years and had an exemplary and unblemished record with the Department. During Mardi Gras 1981, he was working in plainclothes processing lost juveniles and handling other juvenile-related activities. Plaintiff and his partner were both assigned to duty on the evening of March 1, 1981. This was the evening of the Bacchus parade in New Orleans. Early in the evening he and his partner processed a lost juvenile and took that child to a Family *1033 Services van located at the intersection of Canal and Royal Streets. He was supposed to report to duty at the corner of Canal and Tchoupitoulas Street at that time. He testified that because of the heavy crowds that had gathered in the area to see the parade, it was impossible for him to reach the intersection to which he was assigned. He had radioed in to the base station to inform them that he was processing the lost juvenile at the Family Services van, but failed to report that he would not be proceeding to his assigned position. It rained intermittently that night, and the plaintiff removed his jacket. He assisted in getting parade spectators to move back from the street in order to allow room for the parade to pass. At this time the St. Augustine High School Band was approaching the area in which the plaintiff was working. Because the band formation was quite wide, there were chaperones who assisted in making sure that the crowd at the parade was well out of the band’s way. There was testimony in the record from several witnesses, that people associated with the band were pushing and shoving people back from the street with undue force. Except for the testimony of Mr. Jasper, a band chaperone, all eyewitnesses to the incident, testified that an altercation broke out between Mr. Jasper and a spectator. According to the plaintiffs testimony and that of the eyewitnesses to the incident, the plaintiff attempted to break up the struggle. The plaintiff testified that his gun, which he was wearing in a holster and which was clearly visible because he had removed his jacket, became dislodged. He is unsure whether the gun was dislodged because someone was trying to draw it or from the pushing and shoving that was occurring. The plaintiff testified that he drew his revolver because he was unable to try to re-holster the gun and at the same time keep some type of order. The plaintiff testified he held the gun upward to avoid it being grabbed by someone else in the crowd. This testimony is corroborated by several eyewitnesses. He claims that he did not squeeze the trigger, and that his arm must have been jarred or that the gun accidentally discharged resulting in the fact that someone was grazed by a bullet from the gun. Several eyewitnesses also testified that the plaintiff did hold the gun upward, pointing toward the air, and that several arms were tugging at his elbow. Furthermore, the plaintiff testified that he identified himself as a police officer a number of times during the altercation.
Jasper gave a statement to the police immediately after the incident. He also testified at the hearing. He stated that the plaintiff had grabbed him without warning. He steadfastly denied that he had been involved in any altercation with any spectator or with anyone else along the parade route. He said that the plaintiff grabbed him, spun him around, hit him in the chin and then held a gun to his head. When he heard the shot, Jasper testified that he fell to the ground thinking he had been injured.
Two members of the St. Augustine Band, one a student and the other a chaperone, also testified at the hearing. Neither of them could testify that Jasper was not involved in an altercation with a spectator prior to the plaintiff having entered into the altercation. They testified that the gun was in the direction of Jasper’s head and was moving and just “went off”.
The only other witness, a spectator, testified that he felt that the plaintiff had drawn his gun. He said that he had come forward because he felt that there was no necessity in the incident for the drawing of a gun, but did state that he did not see whether someone had been attempting to withdraw the gun from the holster. Furthermore, he admitted that he may have had three, four, five or six or even more drinks immediately prior to the parade.
In summary, the testimony presented at the hearing with regard to the actual occurrence of the incident can be divided into four major categories: (1) the plaintiff’s testimony of the incident; (2) the spectators’ eyewitness accounts, most of which are in accordance with the plaintiff’s version of the events; (3) the versions presented by the members and chaperones of the band, who did not see the entire incident; and (4) the testimony of Jasper.
*1034 No one in the band was an eyewitness to Jasper’s involvement with a spectator. Jasper’s testimony is somewhat inconsistent with the interview which he gave to the police several hours after the incident. In his interview with the police, he stated that he had been marching backwards and had just turned around when the plaintiff grabbed him and spun him around. At the hearing, however, he testified that he had always been marching forward and had not marched backward. Jasper also testified that the plaintiff did not properly identify himself as a police officer when he first entered into the altercation.
There were four bases on which this disciplinary action against the plaintiff was instituted: (1) removal of his jacket in violation of the dress code; (2) failure to report to his assigned location after processing the juvenile; (3) failure to register his service revolver with the New Orleans Police Department Pawn Shop; and (4) lack of adherence to the law based upon violations of criminal negligence and negligent injury La.R.S. 14:12 and 14:39.[1]
He was dismissed from the Department on the basis of these charges. This decision was upheld by the Civil Service Commission who found that plaintiff had violated all four of these charges. The Commission emphasized that if the plaintiff had not been in an unauthorized location, in unauthorized clothing, doing unauthorized duty, this incident might not have occurred. The evidence is uncontradicted that plaintiff is guilty of at least the first three charges. Furthermore, although plaintiff at the time of his conviction, had not been convicted of violations of La.R.S. 14:12 and 14:39, the internal rules of the Police Department require:
“Neither ignorance of the law, its interpretations, nor failure to be physically arrested and charged, shall be regarded as a valid defense against the requirement of this rule.” [requiring adherence to the law].
The incident was investigated by the police internally. The three officers who were involved in the investigation, testified at the hearing, and as pointed out by the Civil Service Commission, their testimony differed in regard to the gravity and severity of the incident. The Commander of the Internal Affairs Division testified that he had recommended to Chief Morris “heavy discipline” for the plaintiff which he defined as “anything from a 30-day suspension up to and including dismissal.” Another investigating officer testified that the conflict in testimony among all the witnesses was so gross that they could not have formed a basis for indictment for plaintiff’s actions. A third investigator, however, found the charges well justified.
The plaintiff argues that the decision of the Police Chief to dismiss him from the force was grounded in the tension and atmosphere which existed in the Police Department following the so called “Algiers incident, involving the shooting of a police officer and allegations of police mis-conduct in the subsequent investigation which resulted in three deaths.
David Kent, Supervisor of the Homicide Section for the Police Department, testified that the Police Department was in a state of near hysteria after the Algiers incident, and a Director of the Internal Affairs Division testified, however, that there was no “unique sensitivity” to this case because of the Algiers incident.
The Commission apparently thought that this argument was an insult to its intelligence and sought merely to undermine the objectivity of the Commission. Based upon the evidence presented at the hearing, it is impossible for us to hold that the Algiers incident affected the decision of the Police Chief in the instant case.
Had plaintiff violated the prohibitions against removing his jacket, failed to report to his appointed station, and not properly registered his gun, and the incident had not occurred, any sanctions imposed upon him *1035 would clearly not be of a severe nature. As the Civil Service Commission pointed out, the criminal violations brought against plaintiff are “the crux of the matter before us.”
The testimony of the witnesses to the incident is conflicting. The only group of witnesses whose testimony is in agreement is the spectators. Their testimony would also seem to be the most unbiased of the witnesses. Accepting their testimony as the most reliable, we cannot find that plaintiff’s dismissal was justified. His actions on the night of March 1, 1981 may have been ill-taken in retrospect, but they are not sufficient cause for the dismissal of an exemplary eleven-year veteran of the police force. See Branighan v. Department of Police, 362 So.2d 1221 (La.App. 4th Cir. 1980).
We usually are bound by the lower court’s determinations of the credibility of witnesses. When that determination is manifestly erroneous, however, as in this case, we are not bound by this rule. The record does not support the finding that plaintiff’s actions were of such a criminal nature to require his dismissal.
For the foregoing reasons, the decision of the Civil Service Commission is reversed, and plaintiff is to be reinstated as of the date of this decision. Because, however, his actions, although not requiring his dismissal, were of such a nature that some penalty is necessary, plaintiff, therefore, is to be considered as having been suspended without pay for sixty (60) days. He is to be restored to the same rank and with the same privileges that he had when he was dismissed.
REVERSED.

. Although the charges brought against plaintiff include a violation of La.R.S. 14:12, we note that this statute is not a substantive offense, but simply a definition of criminal negligence. La.R.S. 14:39 proscribes negligent injury accomplished by criminal negligence.