454 So.2d 106 (1984)
Orman J. WALTERS, Jr.
v.
The DEPARTMENT OF POLICE OF the CITY OF NEW ORLEANS.
No. 83-C-1396.
Supreme Court of Louisiana.
June 25, 1984.
*107 Salvador Anzelmo, City Atty., Bernette J. Johnson, Deputy City Atty., Charles J. Willoughby, Asst. City Atty., for applicant.
Sidney M. Bach, Gerald Wasserman, Bach & Wasserman, New Orleans, for respondent.
DENNIS, Justice.
We granted certiorari in this civil service disciplinary case to review the court of appeal's judgment reversing a civil service commission order which upheld the dismissal of a police officer by the New Orleans Police Department. Walters v. Department of Police, 430 So.2d 1032 (La.App. 4th Cir.1983). Police Officer Orman J. Walters, Jr. was dismissed following an incident during a 1981 Mardi Gras parade in which he accidently discharged his handgun and injured two persons. The civil service commission upheld the dismissal. The court of appeal reversed the civil service commission's decision because of manifestly erroneous findings of fact and reduced Walters' punishment from dismissal to sixty (60) days suspension, without pay, but without loss of rank or privileges. We agree that the commission's decision, which is based on errors of both fact and law prejudicial to Walter's substantial rights, must be reversed. Because of the discretion vested by the constitution in the commission to determine legal cause for discipline and punishment commensurate therewith, however, the court of appeal erred in substituting its de novo findings for the commission's. Accordingly, the court of appeal judgment will be amended to simply reverse the commission's decision and remand the case to it for further proceedings consistent with this opinion.

I. Background Facts
On March 1, 1981, Orman J. Walters, Jr., a New Orleans police officer assigned to the Family Services Division, was instructed to station himself at a corner of Canal and Tchoupitoulas Streets during the Bacchus parade for the purpose of tending to lost children and apprehending juvenile offenders. Upon taking custody of a child, it was Walters' duty to take him to a Family Services van three blocks away at the corner of Canal and Royal Streets for processing and transfer to other officers. Family Service Division officers, such as Walters, were required to wear plainclothes to facilitate their work with children. Walters and one other officer requested permission on the day in question to wear uniforms clearly identifying them as police officers to parade spectators. The department denied their request.
Before the parade reached Walters' location, he and his partner, Officer Oubre, received a lost juvenile and took him to the van at Canal and Royal. Walters decided to stay at the van during the parade because *108 he thought he was needed at this location. He notified his base station by radio of his arrival at the van but did not call back to notify anyone of his decision to stay during the parade.
Within minutes of Walters' arrival at the police van a light rain began to fall. Walters removed his jacket because the rain had begun to cause it to discolor. In so doing, Walters acted in violation of the department's regulation which requires an officer dressed in plainclothes to wear a coat over his firearm. At the time of the altercation, Walters' holstered revolver was visible.
As the Bacchus parade passed, Walters observed that a St. Augustine High School Band chaperone had become involved in a physical conflict with a spectator. Walters rushed into the street and proceeded to pull the chaperone away from the spectator. Numerous band members and spectators attempted to restrain the officer. During the course of this struggle, Walters' revolver came partially out of its holster. The officer removed it completely and pointed it skyward to avoid its being taken by the crowd. As the scuffle continued, Walters accidently pulled the trigger, causing the firearm to discharge once. Two persons, a band member and a spectator, were injured.
Following an internal police department investigation, Walters was dismissed effective April 22, 1981. The department notified him of his discharge by a letter dated April 21, 1981 which stated that it had found he violated departmental rules and committed acts prejudicial to the police department by: (1) removal of his jacket in violation of the dress code; (2) failure to report to his assigned location; (3) failure to register his service revolver; (4) failure to adhere to the laws of the state by committing negligent injuring in violation of R.S. 14:39.

II. The Civil Service Commission's Opinion
As an employee with permanent status, Walters appealed to the Civil Service Commission. After considering the evidence taken at a hearing conducted by a hearing examiner, the commission upheld Walters' dismissal.
The following factual summation by the Civil Service Commission contains its findings of facts relevant to the question of whether legal cause existed for disciplinary action against the appellant:
"Basically, this case arises out of an incident that occurred the night of the Bacchus parade in the vicinity of Canal and Royal Streets. An altercation took place between Mr. Glen Jasper, a chaperone with the St. Augustine Band, and the appellant. At some point during the altercation, the appellant fired one shot injuring two bystanders.

* * * * * *
"For the sake of clarity, we will consider each charged violation separately:
"One, Rule 4, paragraph 2., relative to instruction from an authoritative source. The City presented Sergeant Christopher F. Johnston, who testified that he issued written instructions to appellant relative to where he was assigned on March 1, 1981. The written instructions read, in part `... and then go to the Bacchus parade route and remain stationary at Canal and Tchoupitoulas until completion of the Bacchus parade.' According to Sergeant Johnston, appellant's duties were `arrest of juveniles or lost children brought to him at that location.' He further testified that if there was a change in assignment, appellant was required to notify the platoon commander on duty by radio or telephone, and get further instructions.
"According to appellant, at the end of the day parade, he and his partner went to their assigned location, but everything was quiet, so they rode around the French Quarter. At some point during their cruising, a lost child was brought to them. They took the child to the Family Services Division Van at Canal and Royal Streets. After processing the child, there was still time (approximately 30 to 45 minutes) to get to their assigned location approximately three blocks away.
*109 "According to appellant and Agent Edward Lambert, the person who conducted the investigation, appellant made the decision to remain at Canal and Royal Streets. He reasoned that there was a greater need for his services at Canal and Royal rather than Canal and Tchoupitoulas. Therefore, appellant did not intend to go to his assigned location. However, within one hour the density of the crowd would have prevented him from going to his assigned location. His partner, Officer Oubre, the driver of their car, testified that by this time he was afraid to leave for fear that someone would be injured by their unmarked police car.
"Appellant did not have a radio (his was being repaired) but he borrowed his partner's radio to lodge a report on the missing child, but did not report that he was changing locations and was remaining stationary at Canal and Royal. In fact, appellant first testified that `I had notified my office that I had changed locations.' Later he admitted `I told him (Recruit Wood) that we were now at Canal and Royal with a lost juvenile.' Furthermore, he did not tell anyone that he and his partner did not intend to go to their assigned location. Lieutenant Arthur Perrot, Jr., Assistant Commander of the Juvenile Bureau, testified that officers are given a lot of discretion and appellant could have left his assigned location but should have notified the ranking officer to inform him of the change in location. Appellant failed to do this. His partner must work thirty (30) of his off-days for the specific violation.
"Two, ASOP 118.0, paragraph 1., relative to Uniformplainclothes personnel. According to Officer Edward Lambert, appellant was in violation of the dress code for this assignment. His attire should have consisted of coat/jacket, slacks and tie. Appellant admitted that he was not dressed properly. He said that he removed his leather jacket because it started raining and his jacket was beginning to spot. One other officer removed his jacket and was disciplined for this infraction. The two remaining officers in the van area kept their jackets on. Testimony does reveal that it rained intermittently throughout the evening in question. However, Officer Lambert testified that all officers should have prepared for inclement weather during the Mardi Gras season.
"According to Sergeant Christopher Johnston, the purpose of wearing a coat is two-fold: One, the policeman's weapon is concealed to make it inaccessible to members of the general public. And two, so people, especially children, would not be alarmed to see somebody carrying a weapon. Officer Lambert testified that if appellant had had his jacket on, his weapon would not have been exposed, and maybe would not have been drawn at all. Captain Kenneth J. Dupaquier additionally testified that the reason members of the Family Services Division were wearing plainclothes is because it is better in the handling of children. After all, the handling of children is one of their prime police functions.
"We might also point out that identification for policemen in plainclothes is awkward. It is not visible, such as a badge, but is a wallet-like folder which, when opened, shows the officer's identification. It is usually kept in the pocket of an officer's coat or jacket. It is also a fact that appellant along with Officer Ford had requested permission of Captain Dupaquier to wear their uniforms, so that they might be recognized as policemen. Permission was denied. Captain Dupaquier stated, in his testimony, that next year (1982) all Family Services Division officers would be in uniform. This decision was apparently reached in the aftermath of the case before us.
"Three, ASOP 97.0, paragraph 10., relative to registering of handguns used on duty. Appellant admits that he did not register his service revolver with the New Orleans Police Department Pawnshop as is required by all Police Officers. He testified that he purchased it on Saturday, February 21, 1981 and `I completely forgot to register the gun.' The weapon was a *110 Smith and Wesson .45 caliber six-inch revolver, Serial # N803863.
"There is no contradiction regarding the three aforementioned violations. In actuality, there is an admission by appellant and verification of the violations by several witnesses. The fundamental question is: To what extent do these seemingly minor infractions of departmental rules and procedures initiate and aggravate the situation leading up to two innocent bystanders being injured? We examine this question next.
"Four, Rule 2., paragraph 1., relative to adherence of law. This rule is the crux of the matter before us. There was much discussion at the beginning of the hearing regarding its admissability (sic) as a part of the record. In fact, a Civil Service employee may not be disciplined solely because of an indictment. An independent investigation must be made. In this instance, a Police Internal Affairs Investigation was conducted. Thus, the Commission will also examine this alleged violation.
"Three major officers involved in the investigation of the incident, in which appellant was a participant, testified. To some degree their testimonies differ in regard to the gravity and severity of the penalty for the violation. Agent Lambert stated that appellant's dismissal was based not on the indictment, but on evidence uncovered during investigation. He stated that his investigation was based upon violation of two State Statutes: R.S. 14:12 Criminal Negligence and R.S. 14:39 Negligent Injuring. They read as follows:
"R.S. 14:12 Criminal Negligence

Criminal Negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
"R.S. 14:39 Negligent Injuring

Negligent injuring is the inflicting of any injury upon the person of another by criminal negligence. Further, Agent Lambert testified that departmental procedures declare that'Neither ignorance of the law, its interpretations, nor failure to be physically arrested and charged, shall be regarded as a valid defense against the requirement of this rule.'
"In reality, he continued, the indictment was based on facts deduced and evaluated from thirty (30) witnesses as part of his investigation. Also, the charges were reduced from `use of force' to criminal negligence and negligent injuring because appellant `did not intentionally fire his weapon', said Agent Lambert. Sergeant John E. McKenzie, the Platoon Commander, stated that from his investigation, the conflict in testimony among the thirty (30) or more witnesses was so gross that they should not have formed a basis for appellant's indictment.
"Agent Edgar M. Morgan, Jr., Commander of the Internal Affairs Division, testified that he recommended to Chief Morris `heavy discipline' in the case of appellant. He stated, `heavy discipline to me is anything from a thirty-day suspension up to and including dismissal'.
"We can not speak to the indictment charge which is a judicial matter, however, Chief Morris apparently made the decision, upon facts at his disposal, regarding suspension and dismissal of appellant.
"As far as we are able to determine, with certain noted contradiction, appellant while in the vicinity of Canal and Royal Streets began to engage in crowd control during the passing of the St. Augustine band. The band was part of the Bacchus parade. More specifically, according to appellant, he went to break up a scuffle between a male, described as a St. Augustine chaperone, and an unidentified male spectator. The scene then shifts to a scuffle between appellant and the St. Augustine chaperone. Both claimed to be punched by the other. Both deny throwing any punches. No witness testified to having seen punches thrown by the appellant, the St. Augustine chaperone, or an unknown spectator. The only eyewitness to the initial scuffle between *111 the chaperone and the spectator reported that appellant attempted to separate the two (Jenkins testimony). All eyewitnesses report only pushing and shoving by appellant, chaperone, and unidentified spectator.
"Both appellant and chaperone agree that appellant grabbed the chaperone from behind by his left arm or shoulder region. Without noticeable identification as a policeman, the chaperone apparently increased his struggles to get away from the unknown person (appellant). Appellant then stated that in a quick succession, he told the chaperone that he was a policeman. At some point, the chaperone heard him over the noise of the crowd. The chaperone stated that he then raised his arms up. Appellant denies this. At about this time, appellant became conscious of the fact that he was surrounded by several persons whom he described as St. Augustine band members.
"The following seem relevant to the ultimate shooting: The appellant became cognizant of the reality that he was in the middle of a concerned, perhaps unfriendly, crowd. The noise was loud; at points, both from the band and the spectators. The appellant was in plainclothes, without visible identity, and with an exposed gun. The band members did not know who the appellant was and reacted with anxiety. However, there is no evidence that appellant was attacked by an onlooker to the scuffle between appellant and the chaperone. Although tension was obviously high, appellant does not state that he felt threatened by anyone, prior to the firing of his weapon.
"As the pushing and shoving continued, appellant grabbed his exposed gun which was becoming unattached from the broken hinge of his shoulder holster, raised the weapon, `pulled Jasper to myself', and in an upward fashion `points but does not aim' his weapon. Appellant reasoned that with the pushing and scuffling, he felt it best to hold onto his weapon in the interest of safety and to prevent someone from taking his weapon from him.
"Appellant recalls making his weapon ready for firing, but admits he does not know how or why he pressed the trigger and fired the weapon. He has no conscious memory of pulling the trigger. He assumes that the firing of the weapon occurred during the scuffle or `maybe someone struck me. I don't remember, but something caused me to pull the trigger'. Fortunately, the St. Augustine chaperone was in a crouched position or the results might have been a great deal more deadly. As it turned out, two persons in the crowd were injured by a single shot fired by appellant.
"The situation seems to have escalated very rapidly and quickly got out of control. Most witnesses testified that the entire incident took a few seconds to less than a minute. Other officers converged upon the scene immediately because they had already been called on an unrelated matter. A group of spectators were destroying floats in the area. The protagonists were removed from the scene and gave their statements within the next few hours.
"The appellant's attorney introduces into the transcript the possible state of intoxication of appellant. Since intoxication was not a listed violation in appellant's letter of dismissal, we decline to consider it as part of this case.
"In the maze of testimony, there are some undisputed facts:
1. Appellant had been on the New Orleans Police force for more than ten years without previous disciplinary action.
2. Appellant was at an unauthorized location during the 1981 Bacchus parade.
3. Appellant was not wearing assigned, official clothing for on-duty activities.
4. Appellant did have his service revolver exposed to public view.
5. Appellant had not registered his service revolver with the New Orleans Police Department Pawnshop.
6. Appellant was not wearing any visible identification as a Police Officer.

*112 7. Appellant had access to a radio, but did not use it to request or inform his Platoon Commander of his change in location.
8. Appellant did fire one shot into a crowd injuring two bystanders.
"The Commission cannot help but call attention to the following: If appellant had not been in an unauthorized location, in unauthorized clothing, doing what he was not assigned to do, this unfortunate incident may not have happened. Put another way, if appellant had followed his instructions from an authorized source, this particular incident could have been averted. Thus, non-compliance to administrative departmental regulations may have precipitated and contributed to the situation to such an extent that appellant cannot be considered blameless. Taken together, the several seemingly minor infractions of police regulations escalated into a major incident.
"It is the opinion of the Commission that appellant used poor judgment in what we believe to be an `avoidable accident'. In summary, several factors lead to this conclusion:
1. Appellant was not where he was assigned on the evening of March 1, 1981.
2. Appellant decided to remove his jacket exposing his large weapon to public view.
3. Appellant did not elect to wear his gun under his shirt. This would have been a wise procedure (Johnston testimony).
4. Appellant did not immediately identify himself before the fracas as a Police Officer, although he knew he was not wearing any visible identification as a Police Officer.
5. Appellant decided to grab the identifiable St. Augustine chaperone instead of assisting him in obtaining crowd control of an unidentified male spectator.
6. Appellant did not temporarily release the chaperone to secure his weapon. This could have been done because the two were encircled. Also, the chaperone was identifiable, and could not leave the scene.
"Appellant admits removing his gun from his holster and pointing it. However, appellant explained why he did it. There is no evidence that appellant intentionally fired his gun. Nevertheless, under Louisiana Statute R.S. 14:12, `intent' need not be present in order for a person to be in violation of a said Statute."

III. Court of Appeal Decision
From the Commission's order upholding his dismissal, Walters appealed to the court of appeal. After hearing oral arguments, the court of appeal reversed, concluding that the record does not support the commission's determination that Walters' actions were of such a criminal nature as to require his dismissal. The court ordered the department to restore Walters to his position and to impose alternative punishment of suspension for sixty days. 430 So.2d at 1032. We granted writs to determine whether the reversal of the commission's decision was justified.

IV. Legal Precepts
The Louisiana Constitution of 1974 establishes a city civil service including all persons holding offices and positions of trust or employment in the employ of the City of New Orleans. Because the electors of New Orleans failed to exclude its paid firemen and municipal policemen therefrom by an election called within one year after the effective date of the constitution, these employees are included in the classified city civil service. La. Const. art. X, §§ 1(B), 2.
The Louisiana Constitution of 1974 establishes a city civil service commission and a department of city civil service in each city having a population exceeding four hundred thousand. La. Const. art. X, §§ 4, 6. An employee who has gained permanent status in the classified city civil service cannot be subjected to disciplinary action by his employer except for cause expressed in writing. He may appeal from such disciplinary action to the City Civil Service Commission, and the burden of proof on appeal, *113 as to the facts, is on the appointing authority. La. Const. art. X, § 8.
The Civil Service Commission has the exclusive power and authority to hear and decide all removal and disciplinary cases, with subpoena power and power to administer oaths. It may appoint a referee to take testimony, with subpoena power and power to administer oaths to witnesses. The Commission's decision is subject to review on any question of law or fact upon appeal to the court of appeal. La. Const. art. X, § 12(B).
This court has formulated jurisprudential precepts to guide the Commission and the courts of appeal in applying these constitutional principles. "Cause" for the dismissal of a person who has gained permanent status in the classified civil service has been interpreted to include conduct prejudicial to the public service in which the employee in question is engaged or detrimental to its efficient operation. Leggett v. Northwestern State College, 242 La. 927, 140 So.2d 5 (1962); Brickman v. New Orleans Aviation Board, 236 La. 143, 107 So.2d 422 (1958); Jais v. Department of Finance, 228 La. 399, 82 So.2d 689 (1955); Gervais v. New Orleans Department of Police, 226 La. 782, 77 So.2d 393 (1955). The Commission has a duty to decide independently from the facts presented whether the appointing authority has good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed is commensurate with the dereliction. See Brickman v. New Orleans Aviation Board, supra 107 So.2d at 434 (1958) (McCaleb, J., dissenting). A reviewing court should not reverse a commission conclusion as to the existence or absence of cause for dismissal unless the decision is arbitrary, capricious or an abuse of the commission's discretion. Jones v. Louisiana Department of Highways, 259 La. 329, 250 So.2d 356 (1971); Konen v. New Orleans Police Department, 226 La. 739, 77 So.2d 24 (1954). On the other hand, the judicial review function is not so limited with respect to the commission's decisions as to jurisdiction, procedure, and interpretation of laws and regulations. Konen v. NOPD, supra.
The standard to be applied by a court in reviewing the commission's factual findings has changed over the years. Under the previous constitution, which provided that the commission's findings of fact were final, La. Const. art. XIV § 15(O)(1) (1921), this court held in a variety of decisions that the agency's factual findings would not be disturbed if there is of record "any evidence," Leggett v. Northwestern State College, supra; "substantial evidence," Konen v. New Orleans Police Department, supra; "some evidence," Gervais v. New Orleans Police Department, supra or "probative evidence," Mayerhafer v. New Orleans Police Department, 235 La. 437, 104 So.2d 163 (1958), to support them. See H.F. Sockrider, Dismissal of Louisiana State Civil Service Employees, 23 La.L.Rev. 121 (1962). These standards of review of factual determinations, however, have been superseded by the new constitutional rule that the commission's decision is subject to review on any question of law or fact. La. Const. art. 10 § 12. Accordingly, a reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review in deciding whether to affirm the commission's factual findings. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973). See, Sanders v. Department of Health and Human Resources, 394 So.2d 629 (La.App. 1st Cir. 1980); writ denied, 399 So.2d 602 (La.1981); Herbert v. Department of Police, 362 So.2d 1190 (La.App. 4th Cir.1978); Michel v. Department of Public Safety, Alcoholic Beverage Control Board, 341 So.2d 1161 (La.App. 1st Cir.1976); writ denied, 343 So.2d 1078 (La.1977).
Thus a multifaceted review function is committed to the court in civil service disciplinary cases. In reviewing the commission's procedural decisions and interpretations of law the court performs its traditional plenary functions of insuring procedural rectitude and reviewing questions of law. Due concern both for the intention of *114 the constitution and for the boundaries between the functions of the commission and of the court, however, demands that a reviewing court exercise other aspects of its review function with more circumspection. In reviewing the commission's findings of fact, the court should not reverse or modify such a finding unless it is clearly wrong or manifestly erroneous. In judging the commission's exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the court should not modify the commission's order unless it is arbitrary, capricious or characterized by abuse of discretion. Cf. La.R.S. 49:964; Save Ourselves, Inc. v. The Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984); Weyerhaeuser Co. v. Costle, 590 F.2d 1011 (D.C. Cir.1978); K. Davis, Administrative Law (1982 Supp.) at 536 et seq.

V. Application of Legal Precepts
Applying these precepts to the evidence of record, we conclude that the commission committed manifest error in its factual findings in several crucial respects: (a) The commission was clearly wrong in finding that "there is no evidence that appellant was attacked by an onlooker to the scuffle between appellant and the chaperone." A second band chaperone testified that he joined in the fight between Walters and his chaperone colleague. Two other witnesses testified that the band members and chaperones surrounding Walters pushed and pulled the officer and grabbed at his arm and gun. No witness directly contradicted this testimony although two of the witnesses who stated that they had been in a position to see the entire episode testified that they were uncertain whether band members and chaperones interceded in the scuffle between Walters and Jasper. In sum, there was clear and convincing evidence that the crowd surrounding Walters and the chaperone pulled and tugged at the officer during the altercation. (b) The evidence does not support the commission's factual finding that Walters "recalls making his gun ready for firing." Walters testified that he removed his revolver from its holster solely to prevent it from being taken or tampered with by someone in the crowd. There is no suggestion in his testimony that he ever prepared or intended to fire the weapon. (c) If, by finding that Walters "admitted removing his gun and pointing it," the commission determined that he intentionally pointed it at someone, this finding is clearly wrong. Walters testified that he acted exclusively in the interest of safety by removing the handgun and pointing it skyward. (d) On the other hand, the commission should have found as a fact that the police department's policy requires each officer to carry his weapon at all times and apprehend lawbreakers even when not engaged in his primarily assigned duties. The existence of this policy is clearly supported by the evidence and is essential to understanding the true nature of Walters' actions. Moreover, the police department's actions and the commission's opinion tacitly acknowledge that a plainclothes officer is expected to break up street altercations, engage in crowd control and wear his revolver in parade crowds. Otherwise, Walters would have been charged and disciplined on these grounds rather than for dress code, gun registration and unassigned location violations.
In other instances, the commission made findings of fact but failed to appreciate fully their implications made manifest by the record: (a) The police department helped to create the situation from which the accident in this case arose by exposing armed plainclothes officers to crowd control duties. This danger is obvious and was pointed up by Walters' futile request to wear a uniform on the day in question and by the department's change of policy after the accident by requiring Family Services officers to wear uniforms during subsequent Mardi Gras parades. (b) As the commission noted, identification for a policeman in plainclothes is awkward, because his badge consists of a wallet-like folder kept in the officer's pocket which he must remove and unfold for display. Thus, by removing his coat and revealing his large service revolver Walters actually *115 made himself more, rather than less, readily identifiable as a policeman. (c) Walters' failure either to return to his assigned location or to notify his office of his intention to remain at the van during the Bacchus parade was not a major transgression. As the commission noted, one witness testified without contradiction that Walters had the discretion to change his location during the parade but should have notified his ranking officer. Moreover, there is no indication in the record that Walters' compliance with this duty would have protected him from the overall risk created by the department in exposing plainclothes officers to the exigencies of crowd control. (d) Walters testified without contradiction that he purchased his Smith and Wesson .45 caliber six inch revolver one week before the incident and simply forgot to register it. Walters' one week delay in registering his new revolver has little or no relevance to the serious issues in this case. The record and the commission's reasons fail to suggest any connection between the lack of registration and the accident in this case.
Considering the facts validly found by the commission, but also taking into account the manifest errors in its findings, we conclude that the commission fell into an error of law by concluding that Walters' actions constituted negligent injuring.
Negligent injuring is the inflicting of any injury upon the person of another by criminal negligence. La.R.S. 14:39. Criminal negligence exists when "there is such disregard for the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:12.
Criminal negligence corresponds to the concept of "gross negligence" in tort law. See Reporter's Comment, La.R.S. 14:12. Its meaning is similar to the terms "gross negligence or recklessness" which have been used often in criminal statutes. The ordinary negligence sufficient to support a civil action is not enough. See Reporter's Comment, La.R.S. 14:12. Accordingly, in a civil service disciplinary proceeding based on a charge of negligent injuring, the appointing authority is required to prove more than ordinary negligence on the part of the employee. It must prove gross negligence or a gross deviation from the standard of ordinary care. See State v. Jones, 298 So.2d 774 (La.1974).
The evidence produced by the police department does not reasonably support the conclusion that Walters was guilty of criminal negligence. Walters' failure to return to his assigned station at Canal and Tchoupitoulas did not constitute even civil negligence causing the accident, since Walters would have been obliged to break up an altercation at that location also. His removal of his jacket, his failure to identify himself as a police officer before entering the fracas, his failure to grab the spectator instead of the chaperone, and his failure to release the chaperone temporarily to secure his weapon, as found by the commission, are at most only acts of ordinary negligence. None of these facts constitute a basis for a reasonable inference of gross negligence or gross deviation below the reasonable standard of care. The commission reasonably found from the evidence that Walters did not intentionally fire the revolver, and the record does not reasonably support a finding that he aimed, pointed, or prepared to fire the weapon. Although his activation of the trigger may have constituted a high degree of ordinary negligence, under the circumstances it cannot be construed reasonably as disregard of the interest of others so substantially greater than ordinary negligence, as to amount to gross negligence.
Accordingly, for the reasons assigned, the court of appeal judgment is amended to reverse the commission's decision and remand the case to the commission for further proceedings consistent with this opinion. Out of respect for the discretion vested in the commission by the constitution to determine whether there is legal cause for discipline and to mete out appropriate punishment when warranted, we will not substitute our judgment for the commission's *116 on what new determinations should be made after the errors we have pointed out have been eliminated. It appears that reasonable minds might reach more than one conclusion in this case. Accordingly, the commission's decision is simply reversed and the case is remanded to it for further proceedings consistent herewith. The court of appeal judgment is amended to conform with this judgment.
AMENDED AND REMANDED.
DIXON, C.J., concurs in the result.
MARCUS, J., concurs in part and dissents in part and assigns reasons.
MARCUS, Justice (concurring in part and dissenting in part).
I concur in the majority opinion except for remanding the case to the commission for determination of an appropriate punishment. Considering the court of appeal's duty under La. Const. art. 10, § 12 to review the commission's decision on any question of law or fact, the existence of a complete record on appeal, and, in the interest of judicial economy, it is better policy to allow the court of appeal to set the punishment it finds warranted by the circumstances. I consider the sixty-day suspension, without pay, but without loss of rank or privileges fixed by the court of appeal, to be appropriate in this case. Accordingly, I concur in part and dissent in part.