974 So.2d 87 (2007)
Henry HINES
v.
DEPARTMENT OF POLICE.
No. 2006-CA-1218.
Court of Appeal of Louisiana, Fourth Circuit.
December 19, 2007.
*88 Gary M. Pendergast, New Orleans, LA, for Plaintiff/Appellant.
Joseph V. DiRosa, Jr., Chief Deputy City Attorney, Victor L. Papai, Jr., Assistant City Attorney, Penya Moses-Fields, City Attorney, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY III, Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS JR., Judge.
The plaintiff/appellant, Henry Hines("Lieutenant Hines"), a former lieutenant with the New Orleans Police Department ("NOPD"), appeals his termination from the department as discipline for actions taken after Hurricane Katrina. For the reasons that follow, we reverse the decision of the Civil Service Commission ("CSC") and modify the discipline to be imposed.
Lieutenant Hines was first hired by the NOPD in October 1982. At the time of Hurricane Katrina, he was a lieutenant and head of the Downtown Development District ("DDD"), commanding a unit of two sergeants and approximately 14 police officers. The DDD falls under the jurisdiction of the 8th Police District and was responsible for patrols and calls for service in an area roughly bounded by Canal Street, North Rampart Street, Howard Avenue, and the Mississippi River in New Orleans.
It is undisputed that Lieutenant Hines and his unit reported for duty on 28 August 2005, the day before Hurricane Katrina hit the City of New Orleans. Lieutenant Hines left New Orleans with all but four of his command on 31 August 2005.[1] Everyone, but Sergeant Berger, went to *89 Baton Rouge.[2] Most of his unit returned on 3 September 2005; some of his personnel, however, refused to return because Lieutenant Hines was not receiving support from other officers of the NOPD.
Upon returning to New Orleans, Lieutenant Hines and his personnel were reassigned to other units and on 27 September 2005, a formal investigation was begun by the NOPD's Public Integrity Bureau ("PIB"). A final report was completed and submitted on 5 December 2005. On 5 January 2006, a pre-disciplinary hearing was conducted where a violation of neglect of duty was sustained. The recommendation was for Lieutenant Hines to be demoted to Police Sergeant, suspended for thirty days, and be suspended for forty-five days for not answering truthfully during the investigation.
After the hearing, the matter was reviewed by NOPD Superintendent Warren J. Riley ("Chief Riley") who increased the discipline for violation of neglect of duty from a thirty-day suspension and demotion to termination. Lieutenant Hines appealed and the matter was heard by the CSC on 21 March and 7 April 2006. On 15 August 2006, the CSC upheld the discipline imposed by the NOPD and dismissed Lieutenant Hines' appeal. He now seeks relief from this court.
Lieutenant Hines has assigned two errors for our review. First, he argues that the CSC committed manifest error in dismissing his appeal because under the conditions imposed by Hurricane Katrina, no discipline was warranted. In the alternative, Lieutenant Hines contends that the CSC committed manifest error in upholding the discipline imposed by the NOPD because it is excessive.
In Smith v. New Orleans Police Department, 99-0024, pp. 5-6 (La.App. 4 Cir. 9/22/99), 743 So.2d 834, 837-38, this court set forth the standard of appellate review regarding civil service disciplinary cases:
In civil service disciplinary cases, an appellate court is presented with a multifaceted review function. Walters v. Department of Police of the City of New Orleans, 454 So.2d 106 (La.1984). First, as in other civil matters, deference will be given to the factual conclusions of the Commission. Hence, in deciding whether to affirm the Commission's factual findings, a reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review. Walters, supra.

* * *
Second, in evaluating the Commission's determination as to whether the disciplinary action is both based on legal cause and commensurate with the infraction, the court should not Modify the Commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion. La. R.S. 49:964.
Legal cause exists whenever an employee's conduct impairs the efficiency of the public service in which the employee is engaged. Cittadino v. Department of Police, 558 So.2d 1311 (La.App. 4th Cir. 1990). The Appointing Authority has the burden of proving the impairment. La. Const. Art. X, Sec. 8(A). The appointing authority must prove its case by a preponderance of the evidence. Cittadino, supra.

"Arbitrary or capricious" can be defined as the lack of a rational basis for the action taken. Shields v. City of Shreveport, 579 So.2d 961 (La.1991). A *90 reviewing court should affirm the Civil Service Commission conclusion as to existence or cause for dismissal of a permanent status public employee when the decision is not arbitrary, capricious, or an abuse of the Commission's discretion, as presented in this case.
Employees with the permanent status in the classified civil service may be disciplined only for cause expressed in writing. La. Const., Art. X, Sec. 8(A). Disciplinary action against a civil service employee will be deemed arbitrary and capricious unless there is a real and substantial relationship between the improper conduct and the "efficient operation" of the public service. Newman v. Department of Fire, 425 So.2d 753 (La. 1983).
Pursuant to La. R.S. 49:964, the court is guided by the following:
G. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
The CSC has the duty to decide independently from the facts presented whether the NOPD had good and lawful cause for taking the disciplinary action and, if so, whether the punishment imposed is commensurate with the dereliction. Razor v. New Orleans Police Department, 04-2002 (La.App. 4 Cir. 2/15/06), 926 So.2d 1.
The CSC appeal was heard on 21 March and 7 April 2006. On 21 March, testimony was taken from Superintendent Riley, Deputy Superintendent Steven Nicholas ("Deputy Chief Nicholas"), and Lieutenant Joseph Waguespack. Lieutenant Waguespack was assigned the PIB investigation of Lieutenant. Hines on 29 September 2005 and submitted his report on 5 December 2005. He knew that all of Lieutenant Hines' personnel were also investigated, but those investigations were dropped because the personnel were following the orders of Lieutenant Hines. Lieutenant Waguespack was advised that all but four of the DDD left with Lieutenant Hines; the four remaining patrolmen were reassigned. In his statement, Lieutenant Hines said that on 31 August he heard a radio broadcast that the water was rising quickly and everyone was going to die. After he heard that, he reported the information to his rank. He took full responsibility for ordering his people to leave the city because he feared for their safety. While he also admitted that he had not received permission from a superior to *91 he did state that he had made several attempts to contact his captain.
Lieutenant Waguespack stated that from his own experience, he never had a problem contacting a ranking officer. He also stated that he had no difficulty finding food and housing for his own personnel. He also admitted that no one who worked for him had any serious health problems. After the first few days, he was able to obtain prescriptions through the commander of the 4th District.
In his testimony, Chief Riley recalled that the disciplinary recommendation was a 30-day suspension and demotion for the neglect of duty count and a 45-day suspension for the moral conduct (truth-fulness) count. Chief Riley changed the discipline to termination. His decision to do so was based on the fact that Lieutenant Hines left the city during a tragic time without permission of a superior, that he abandoned some of his personnel, and because he did not think that Lieutenant Hines would be able to effectively lead any command as either a sergeant or lieutenant. Chief Riley stated that there was absolutely no reason to leave the city when the NOPD needed everyone to be here. Under questioning by Lieutenant Hines' attorney, Chief Riley admitted that all he reviewed was the PIB report in making his decision.
The final witness on 21 March 2006 was Steven Nicholas, Deputy Superintendent, and Chief of Operations. In support of the truthfulness violation, Deputy Chief Nicholas said that Lieutenant Hines' statement that he could not find four of his officers was contradicted by the four officers' statements. In particular, because the officers knew Lieutenant Hines was leaving, Lieutenant Hines must have known where they were. In addition, the statements from those officers indicated that Lieutenant Hines was in a "panic mode" when he left the city. He was allegedly shaking the officers, asking if they wanted to die. Deputy Chief Nicholas admitted, however, that as a result of the PIB report, there was no untruthfulness allegation.
In testifying about the neglect of duty charge, Deputy Chief Nicholas stated that Lieutenant Hines' disappearance put citizens in danger and his superiors did not know if something had happened to him. This was a situation that was going to be dealt with severely. Also taken into account was the fact that Lieutenant Hines took other officers with him when he abandoned his post. Lieutenants and captains were being held to a higher standard than ordinary police officers.
Deputy Chief Nicholas admitted that the PIB file contained only the statement of Lieutenant Hines; no other formal or written statements were taken. In support of the moral conduct charge, Chief Riley relied solely on what Deputy Superintendent Marlon A. Defillo told him.
On the second day of the hearing, four witnesses testified: Officer Lawrence Hall, Jr.; Captain Kevin Anderson, the commander of the 8th District and Lieutenant Hines's supervisor; Sergeant Berger; and Lieutenant Hines. Officer Hall was one of the officers under Lieutenant Hines' command and one of the four officers who did not leave the city. He stated that at approximately 11:00 a.m. on 31 August 2005, he was assisting another officer in attempts to control looting on Canal Street. Officer Rhonda Hill, also with the DDD, told him that Lieutenant Hines and Sergeant Berger wanted to see him. When he went over to the police car parked in front of the Sheraton, he also saw Officer Stephens. Officer Hall admitted that he spoke only with Sergeant Berger who was standing under the canopy of the hotel; Lieutenant Hines remained in the car. Officer Hall testified that all Sergeant Berger *92 said was, "Get your gear, you're on your own." No one told him where they were going, but Officer Hall told him that they were leaving the city. He said that he was not asked to leave with them but would not have left. He testified that prior to this time he was able to get food from the 8th District and from across the river.
The next witness was Captain Anderson. Lieutenant Hines had been selected by him to be in charge of the DDD. At no time did he authorize Lieutenant Hines to take his unit outside the city of New Orleans. He testified that he did not have any difficulty obtaining necessary food, shelter, or other supplies, including medication, for the members of his unit. In fact, he had already taken in a captain and 18 to 20 officers who were assigned to the Ernest Morial Convention Center. Because the Omni Royal Hotel let the NOPD use the entire hotel and its food supplies, Captain Anderson stated that they probably did better than most in terms of supplies. He claimed that Lieutenant Hines never approached him for food or supplies. Captain Anderson stated that he no longer had confidence in Lieutenant Hines' ability to lead other officers.
Captain Anderson said that on 31 August 2005, he was approached by Officer Hall, who stated that his rank had left and asked to be attached to the 8th District. Thereafter, the three other DDD officers were housed at the Omni Royal Hotel, the 8th District's de facto headquarters, and all four began working under him.[3]
Sergeant Berger was the next witness. He stated that at no time did he witness any acts of cowardice by Lieutenant Hines. No one from the 8th District ever invited them to the Omni Royal Hotel.
After the storm had passed, the DDD was assigned the job of removing looters from all of the Canal Street stores. Sergeant Berger said it was dangerous work because they did not have enough weaponry and the stores were dark. When they went to the Omni Royal Hotel and saw that the officers were heavily armed, Lieutenant Hines asked for a shotgun to continue the job of stopping looters. Sergeant Berger said that he did not get one. Lieutenant Hines told Captain Anderson that the 2nd District was moving across the river, but Captain Anderson already knew that.[4] However, the news that the 2nd District was pulling out frightened Sergeant Berger because the water was rising quickly and he was concerned that their cars would be flooded.
The DDD also went to the 4th District in Algiers. Sergeant Berger said that they sat outside of the station for about an hour. From what he understood, the 4th District was hoarding their supplies; there were a lot of people there because the area did not flood and he believed that the 4th District was worried about running out of provisions for themselves.
Consequently, the DDD returned to the downtown area of New Orleans. When asked why the DDD did not move into the Omni Royal Hotel with the rest of the 8th District, Sergeant Berger explained that there had always been animosity towards the DDD. In addition, because the 8th District did nothing to assist the DDD with the looting problem, the DDD did not believe that the 8th District would do anything for them at all. In addition, Sergeant Berger stated:
The department may try to portray this as they were prepared and everything was hunky-dory, and I'm telling *93 you it was not. No kind of way no how was it hunky-dory. It was screwed up.
On 31 August 2005, after the DDD was without housing, Sergeant Berger and Lieutenant Hines returned to the Omni Royal Hotel to locate Captain Anderson. They were told at the hotel that there were no more rooms available. Lieutenant Hines then told Sergeant Berger of his worsening medical situation caused by a shortage of prescription medication.[5] It was approximately 1:00 p.m. in the afternoon when the decision to leave was made. The plan was to go to Baton Rouge, stock up on food, water, weaponry, prescription medication, and other supplies, and then return to New Orleans to resume patrols. Lieutenant Hines could have left alone, but took his unit as he feared for their safety.
Sergeant Berger was asked about the statement made by Officer Hall that Sergeant Berger told him: "You're on your own." Sergeant Berger testified that he never said that to Officer Hall. Instead, he told Officer Hall to grab his stuff and meet the DDD at Canal and St. Peters Streets. Officer Hall said "okay" and walked into the Sheraton Hotel. Sergeant Berger did not see him again. Sergeant Berger, also stated that he did not have any communications with Officer Dupre on 31 August 2005. Although they did not leave with Lieutenant Hines, Sergeant Berger stated that Officers Parker and Carter eventually left the city because he spoke with them while they were both in Houston, Texas.
The final witness at the hearing was Lieutenant Hines. On the Sunday before Hurricane Katrina struck, 28 August 2005, Lieutenant Hines took the responsibility of locating housing for his personnel after discovering that the 8th District had failed to do so. As a result, the DDD personnel were in at least three different hotels in the downtown area. Lieutenant Hines explained to his command that they would be working 12-hour shifts and that the shift on duty would remain on the streets patrolling their area until the weather became bad. At that point, the officers were ordered to return to the hotel rooms that Lieutenant Hines had secured for their benefit.
Hurricane Katrina passed through New Orleans on 29 August 2005. The following morning, Lieutenant Hines received word that looting was taking place on Canal Street and he immediately summoned his unit. Initially, it was only DDD officers fighting with looters while wading in knee-high water. Lieutenant Hines and his officers broke off into small groups; each took a different block, moving up Canal Street to Rampart Street. Eventually, they had cleared the businesses on both sides of Canal Street and the looters were disbursed. With limited periods of rest, DDD officers continued to deal with looters throughout the day of 30 August, during which time the water rose higher. Lieutenant Hines made several attempts to locate Captain Anderson.
During the early evening hours of 30 August, Lieutenant Hines arrived at the 8' District Station on Royal Street in the French Quarter. He saw that several members of the district were barbequing and requested food for his unit. He was refused food, but was told that he could find Captain Anderson at the Omni Royal Hotel. Lieutenant Hines went to the hotel but could not locate his supervisor. He saw, however, that the 8" District officers at the hotel were armed with machine guns and shotguns, and had task force and detective unit personnel available. When he requested help in dealing with the looting *94 on Canal Street, he was told that Captain Anderson had told them to stay at the hotel.
That evening, Sergeant Berger heard over his radio that the 2" District was likely going across the river to Algiers and relocating at the 4th District Station. He told Lieutenant Hines, who decided to relocate there as well. Lieutenant Hines summoned his personnel, loaded their police vehicles and went to the 4th District Station. Upon their arrival, they were refused food and aid. Lieutenant Hines became concerned for the safety and welfare of his personnel. While his people remained at the 4th District Station, Lieutenant Hines and Sergeant Berger again attempted to locate Captain Anderson. Lieutenant Hines wanted direction for obtaining food and shelter for his officers.
A few hours later, Lieutenant Hines and Sergeant Berger found Captain Anderson at the Omni Royal Hotel. The DDD was instructed to monitor the rising water situation on Canal and Tchoupitoulas Streets until 9:00 a.m. the next day. Lieutenant Hines returned to the 4th District Station to gather his unit and returned to downtown New Orleans to carry out the assignment. When the assignment ended the next morning, Lieutenant Hines went to his room at the J.W. Marriott Hotel to find that the hotel was closing due to rising water in the rear of the hotel.
Lieutenant Hines returned to the Omni Royal Hotel to locate Captain Anderson, but again was unsuccessful. His last attempt was at approximately 1:30 p.m. on 31 August. At this point, Lieutenant Hines made a decision to make a run to Baton Rouge to retrieve food, water, communications equipment, weapons, and medicine for medical problems from which he suffered. He told an officer at the Omni Royal Hotel of his intentions and asked that Captain Anderson be informed. It was at this time that Lieutenant Hines and most of the unit left the city.
After reviewing the record before us, we find that the CSC was manifestly erroneous and clearly wrong in accepting the NOPD's recommended termination of Lieutenant Hines. We agree that Lieutenant Hines neglected his duties by leaving the city after the storm. However, we find that termination from the department is excessive after 23 years of unblemished service with the. NOPD. It is uncontested that Lieutenant Hines left his post without permission, although the testimony indicates that he tried to contact his supervisor to explain his actions and his concern for the safety of his personnel and his personal medical problems. However, Lieutenant Hines returned to the city with most of his personnel in less than 4 days and was prepared to resume his duties. Lieutenant Hines' testimony was supported by Sergeant Berger's in all respects.
As for Lieutenant Hines' alleged untruthfulness, we find the record insufficient to sustain this charge. Other than the testimony of Officer Hall, there are no statements on which the NOPD can base its decision. Even Officer Hall admits that he never spoke with Lieutenant Hines and no evidence exists to support the claim that Lieutenant Hines knew where the other officers were located. Chief Riley admitted that he relied solely on the PIB report. The testimony also reflects that the PIB report did not support a finding that Lieutenant Hines was untruthful when he gave his statement during the investigation and Chief Riley relied on one of his deputy superintendents to find out what the investigation revealed.
Therefore, we set aside the termination ordered by the CSC and the suspension *95 for forty-five days for Lieutenant Hines' asserted untruthfulness, but affirm the demotion of Lieutenant Hines from lieutenant to sergeant and the imposition of a suspension of thirty days for the violation of neglect of duty. In doing so, we take into consideration the fact that Lieutenant Hines was commander of the DDD and took most of his unit with him when he left the city.
Accordingly, we reverse the decision of the CSC and render judgment as outlined above.
REVERSED AND RENDERED.
NOTES
[1] Lieutenant Hines testified that he could not find four of his officers so he left without them. However, the NOPD contends that the officers went to Captain Anderson stating that they did not think it was right for Lieutenant Hines to leave his, assignment and the city. The NOPD argues that since the officers knew that Lieutenant Hines was leaving, Lieutenant Hines knew where these four officers were located.
[2] Sergeant Berger went to Texas to check on his family, obtained supplies, and returned with Lieutenant Hines on 3 September 2005.
[3] These other officers were Sam Dupre, Sean Carter, and John Parker.
[4] The record reflects that the 3rd District went to Baton Rouge.
[5] Lieutenant Hines suffers from acute gout, an irregular heartbeat, high blood pressure, and acid reflux. In all, he takes five different prescription medications every day.