BELSOME, J.
dissents with reasons.
|,As the majority acknowledges, this incident occurred approximately one month after Hurricane Katrina struck. Although New Orleans was returning to its normal business activities, it nonetheless remained a major metropolitan area in a post-industrial United States, not a hotbed of anarchy and mayhem. Our judgment should not be swayed by the challenges that faced public and private citizens alike during that time, but must rather be based upon the applicable law and procedure.
In this case, we are presented with a disturbing set of facts. A 64-year-old man was placed under arrest by four or more police officers and FBI agents. From all accounts, the arrest was recorded on a video that was broadcast on both CNN and WDSU. Testimony from no less than five witnesses described the altercation or beating, depending on the perspective, that took place during the arrest. Unfortunately, the video that was referenced by the officers and experts who testified at the December 6, 2007 hearing is not the tape in evidence with this Court.[1] What happened to the original footage is *833 unknown. The Commission indisputably viewed the original recording in its entirety, based upon their detailed description of its contents and resulting decision. Whether there was an inadvertent mistake in transmitting the evidence to this Court or whether | ¡.something more sinister occurred will never be known. What is known is that the Fourth Circuit Clerk of Court’s record evidences that the record and exhibits, including the video recording, was checked out by one of the parties on December 8, 2008, and returned on December 22, 2008. It is not known what video recording was in evidence with this Court prior to the record checkout, as the exhibits and record had not yet been reviewed by the Court at that time.
Civil Service Rules have been promulgated to protect workers from unwarranted punishment or retribution by their employer. See Marziale v. Department of Police, p. 13, 2006-0459 (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 768. Consequently, the requirements to discipline an employee are defined within the Civil Service’s departmental rules. Reviewing courts should not overturn a Civil Service Commission’s factual findings absent a rational basis to justify the Commission’s determinations. Walters v. Dept. of Police of New Orleans, 454 So.2d 106, 112 (La.1984).
“[A]s in other civil matters, deference will be given to the factual conclusions of the [Civil Service] Commission.” Bannister v. Dept. of Streets, 95-0404 (La.1/16/96), 666 So.2d 641, 647. Accordingly, the appellate court should not reverse or modify such factual findings unless they are clearly wrong or manifestly erroneous. Walters, 454 So.2d at 112. “In judging the Commission’s exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the [appellate] court should not modify the commission’s order unless it is arbitrary, capricious or characterized by abuse of discretion.” Id. A determination by the Commission is “arbitrary and capricious” if there is an absence of a rational basis for the action taken. Bannister, 666 So.2d at 647.
This writer does not find that the record evidences that the Civil Service Commission’s factual findings were manifestly erroneous or clearly wrong. Nor |sdoes a review of the record in its entirety reveal that the Commission’s determinations regarding the disciplinary action lacked a rational basis. Therefore, this writer differs from the majority’s conclusion that the Commission’s determinations were arbitrary and/or capricious.
The Civil Service Commission’s description of the events contained in the video recording viewed in connection with its decision is as follows:
Important evidence in this case is a videotape of the incident taken by a pedestrian on Bourbon Street. The videotape has received local and national media attention. Reactions vary widely. A portion of the videotape, agreed to by all counsel, was introduced into evidence. It provides a more accurate account of the incident than the simplistic versions testified to by Mr. Davis and Appellant, both of which we take with a grain of salt.
To this observer the videotape shows Mr. Davis receiving several severe blows to the head area by Officer Schilling while Mr. Davis is standing and facing a wall. He does not appear in the videotape to be a threat to the officers as he faces the wall. Appellant swung at Mr. Davis’ neck while he was in this position and “missed” and struck him in his arm with a baton.
*834 Thereafter Mr. Davis is seen on the pavement facing upwards with Appellant crouching beside him. Appellant strikes Mr. Davis at least twice in his head area,[2] at a time when Mr. Davis appears immobilized and offering little resistance. Unfortunately, part of the videotape is obscured by a horse which is being moved by its rider (a policeman) in front of the camera. After the handcuffs are attached and the officers cease contact with Mr. Davis, he lies on the pavement barely moving.
While this incident was being filmed an unidentified pedestrian at the scene is heard on the videotape to say — “Did you get that on film — he surrendered and then they hit him on the head and that’s when he turned around and started fighting ...”[3]
In this case, the Civil Service Commission found that the Appointing Authority had good and lawful cause for taking disciplinary action. The Commission reviewed the testimony and evidence presented at the hearing in making its determinations, most notably that of Appellant, who testified that he |4struck Mr. Davis four times while he was lying on the ground and admitted attempting to strike Mr. Davis in the neck while he was standing against the wall. The Commission also reviewed the testimony of the EMT, Rebecca Calvo, who observed that Mr. Davis had a contusion with laceration[4] to his right eyebrow and a contusion on his entire left eye. Ms. Calvo further testified that Mr. Davis’ face was so swollen with cuts and lacerations that she could not examine his pupils, and that Mr. Davis advised her that he could not open his eyes because it was too painful.
Sgt. Howard Gay of the Public Integrity Bureau also testified. The Commission reviewed his testimony regarding his investigation of the complaint filed against Appellant and his sustaining of charges against Appellant for violations of adherence to law relative to a battery, lack of professionalism and lack of moral conduct. Sgt. Gay viewed a videotape[5] not in evidence with this Court, which he testified as showing Appellant punching Mr. Davis in the head area and bracing Mr. Davis with his knee while on the ground and surrounded by four police officers. Sgt. Gay further testified that the video evidenced Mr. Davis being taken to the ground, at which time he began to bleed. Sgt. Gay stated that Mr. Davis was allowed to stay on the ground, bleeding, for four minutes and twenty-two seconds, until EMS arrived on the scene. Sgt. Gay testified that *835 “[tjhose particular actions, in my estimation, did not concur with the training received at the Police Department, which indicated to me that they were in violation of department rules.”
| ;,The Commission also reviewed testimony from Police Superintendent Warren Riley, who determined that it was necessary to discipline Appellant for violating the proper procedures for applying physical force to restrain or defend against uncooperative or dangerous persons. Supt. Riley testified that he made his determination after viewing a videotape[6] of the incident, reviewing Sgt. Gay’s investigation report, and participating in an official hearing with Operations Chief Officer Steven Nicholas.
Sgt. Donald Harris, the eight-year NOPD training instructor, also testified regarding the force continuum. The Commission noted the levels of the force continuum, beginning with oral directives and progressing to “soft hands,” which he described as an officer using an open hand to direct the individual where to go. Only if the “soft hands” approach is ineffective is limited physical force appropriate, also termed “hard hands.” According to Sgt. Harris, “hard hands” involves the striking of body parts such as shoulders, arms and legs. Specifically, he testified that continuous strikes to the radial muscle on the arm will cause a person’s hand to relax so that the officer may handcuff the individual. Even in situations where “hard hands” are appropriate, Sgt. Harris testified that it is not appropriate to strike an individual in the head area. Sgt. Harris further testified that, from viewing the videotape, Appellant appeared to have struck Mr. Davis inappropriately about the head with “two head blows.”
After reviewing all of the evidence and the aforementioned video recording of the incident, the Commission concluded that the Appointing Authority established a basis for disciplining Appellant for battery, unauthorized use of force and lack of professionalism by a preponderance of the evidence. The Commission further found that Appellant and his partner initiated the incident by intervening in a conversation Mr. Davis started with the mounted police officer, and that Mr. | (¡Davis’ overreaction to this intervention did not by itself justify Appellant’s actions of forcibly bracing Mr. Davis against a wall and striking him in the head area while lying on the pavement. Even with resistance, the Commission determined, Mr. Davis was not a serious threat to the safety of the four officers using force on him. Accordingly, the Commission concluded that Appellant used excessive force.
Considering this evidence in conjunction with the description of the events on the video viewed by the Commission, this writer cannot agree that the Commission’s decision lacks a rational basis. Although a wholly different version of the video was placed in evidence before this Court, it does not follow that the Commission’s determinations are without rational basis simply because the Commission and, notably, the witnesses who testified on behalf of both Appellant and the Department of Police, viewed an alternate version of the video recording of the incident. Unlike the majority, this writer does not find that the record demonstrates arbitrary or capricious behavior on the part of the Commission, or that the Commission abused its discretion, as the record plainly evidences a rational basis for its decision. I must respectfully dissent.
ORDER
hIT IS ORDERED that the application for rehearing filed by the Department of Police be and it is hereby GRANTED.
*836 IT IS FURTHER ORDERED that the appellant be and he is granted twenty (20) days from the date of this Order and the appellee be and it is granted forty (40) days from the date of this Order to file their supplemental briefs, which briefs shall fully explain any step(s) each party took after oral arguments to address the panel’s expressed concern that it was unable to locate or view video evidence relied upon by the Civil Service Commission.
IT IS FURTHER ORDERED that oral argument will be on Tuesday, November 17th, 2009 at 11:00 A.M.
/s/ James F. McKay, III Judge James F. McKay, III
/s/ Roland L. Belsome Judge Roland L. Belsome
/s/ Paul A. Bonin Judge Paul A. Bonin

. Robert Davis testified that he did not view the video of the incident.

. Emphasis in original.

. The Commission noted that the pedestrian’s statement is hearsay, but that it was in the record without objection, and that had there been an objection, it would likely still be admissible as an "excited utterance” or "present sense impression" pursuant to La. C.E. art. 803(1 )(2). The Commission noted that the statement was given limited weight in its determination.

. Ms. Calvo testified that a laceration was “more than an abrasion ... .the skin is actually open.”

. Again, it is noted that the Civil Service Commission’s opinion describes the evidence as a "videotape”; the video recording of the incident in evidence with this Court is a DVD. As the majority notes, Sgt. Gay testified that the videotape he examined in connection with his testimony originated from WDSU, Channel 6, in New Orleans. Additionally, Richard J. Richtofen, Jr., representing the Department of Police at the December 6, 2007 hearing, noted with regard to viewing the video recording of the incident, ‘T’ve just placed in the player a VHS tape.” However, other testimony by Mr. Richtofen references more than one CD being played on a DVD player during Sgt. Gay’s testimony at the December 2007 hearing.

. As the majority notes, Supt. Riley testified that he viewed several videos in connection with the instant case, one of which originated from CNN and included audio.