MAX N. TOBIAS, JR., Judge.
| j Sergeant Ray Byrd (“Byrd”) seeks review of the New Orleans Civil Service Commission’s (“CSC”) decision affirming a forty-day suspension imposed upon him by New Orleans Police Superintendent, Roñal W. Serpas, the appointing authority, for Byrd’s alleged use of excessive force during an arrest and unprofessional conduct. For the following reasons, we affirm.
I.
On 27 June 2010, Byrd, employed by the New Orleans Police Department (“NOPD”) as a police sergeant with permanent status, was working a paid detail near the intersection of Broad Street and Orleans Avenue, during which he participated in the arrest of Muhammad Esmail. Muhammad’s brother, Mubarak Esmail (“Esmail”), interfered with the investiga *976 tion and Byrd elected to arrest him. While attempting to restrain and handcuff Esmail and encountering resistance, Byrd delivered a closed fist strike, or a “stun punch,” to the side of Esmail’s face in an effort to overcome his resistance and to obtain his compliance with the arrest. The incident was captured on video surveillance that became public when it was broadcast ed on the news.
Following the incident, the NOPD Public Integrity Bureau (“PIB”) initiated an administrative investigation to determine whether Byrd’s use of force to secure a non-compliant subject was excessive under the circumstances.[1] Police Sergeant Kevin Stamp (“Stamp”)[2] of the PIB conducted the investigation, including the taking of Byrd’s statement on 1 September 2010. At the conclusion of the investigation, Byrd’s actions during Esmail’s arrest were deemed to have violated the NOPD’s internal regulations concerning Unauthorized Force[3] and Professionalism.[4]
Deputy Superintendent Marlon A. Deffl-lo (“Defillo”) conducted a hearing on the matter on 23 and 28 March 2011. After considering Byrd’s explanation, the evidence, and mitigating circumstances, De-fillo concluded Byrd’s actions warranted disciplinary action and recommended the imposition of a thirty-day suspension for his use of unauthorized force and a ten-day suspension for the violation of the rules of professionalism.
Based on Defillo’s recommendation, and determining that Byrd offered no evidence or testimony during the hearing that tended to mitigate, justify, or explain the actions he took during the arrest, Superintendent Serpas, as the appointing authority, issued a disciplinary letter to Byrd on 3 June 2011, imposing the recommended forty-day penalty. Specifically, the letter advised that the level of force Byrd used to overcome Esmail’s resistance to arrest was excessive[5] and, therefore, constituted an *977 unauthorized force violation. Additionally, the letter noted that the incident was covered by the media, which caused embarrassment to the NOPD; because Byrd failed to conduct himself in a manner equal to the standards established in NOPD policy, his actions constituted a violation of professional conduct. The superintendent concluded that Byrd’s conduct was contrary to the standards as prescribed by Rule IX, Section 1, paragraph 1.1 of the Rules of the CSC, which provides, in pertinent part, that when a classified employee is unable to perform his duties in a satisfactory manner or has committed any act to the prejudice of the service, the appointing authority shall take action warranted by the circumstances to maintain the standards of effective service. This action may include, inter alia, suspension without pay not exceeding 120 calendar days.
Byrd appealed his suspension to the CSC, arguing that his use of force against Esmail was not excessive under the circumstances. A hearing officer was appointed to receive the testimony. At the 11 August 2011 hearing, the parties stipulated that Byrd used force while effecting the lawful arrest of Esmail.
Stamp testified for the NOPD. According to him, Esmail’s brother, Muhammad, was being detained at a gas station for threatening the safety of private citizens by carrying and brandishing a firearm taken from a tow truck parked on the premises. Esmail, believed to have been the owner of the tow truck being driven by his brother, was notified of the situation and arrived at the scene. Esmail was allowed onto the investigative scene by a law enforcement officer to check on the status of his brother at which time he encountered Byrd. Based upon video surveillance, Stamp explained that, initially, a verbal exchange took place between Byrd and Esmail, and then Byrd attempted to physically detain Esmail, who showed resistance by pulling away. Thereafter, Byrd struck Esmail in the head area with less than full force in an apparent attempt to gain Es-mail’s compliance with the arrest. Stamp further testified that because he was unsure from his review of the video surveillance footage whether the use of force taken by Byrd was excessive, he consulted with Officer Charles Badon (“Badon”), a defensive tactics instructor at the NOPD Training Academy.
Badon also testified for the NOPD. According to him, the closed-fist technique used by Byrd to subdue Esmail is no longer taught at the police academy. Instead, because of the potential for injury, police officers are currently trained in techniques that do not include striking subjects who are refusing to place their hands behind their backs for handcuffing, which include verbal commands, hands-on escort,[6] or the arm-bar technique, which forces the subject to the ground. Badon *978 stated that although it would have been more appropriate for Byrd to have employed the arm-bar technique in securing the arrest of Esmail, based upon what he reviewed on the video surveillance, Byrd was struggling with Esmail and unable to get him into the proper position to execute an arm-bar.
Badon further testified that his observation of the video surveillance footage revealed no active resistance on the part of the subject (Esmail) being arrested. He described “active” resistance as involving a subject who turns his aggression (ie., kicking or punching), towards the police officer. He distinguished this from “passive” resistance, which he stated involves a situation where the subject is neither following verbal commands nor engaging in any type of behavior that would bring harm to the arresting officer. In his opinion, even though it did not appear to him from the video that Byrd was using full force or that he was trying to hurt the subject, the level of force exacted by Byrd upon Esmail was not appropriate for the level of resistance displayed, which appeared to him to be more “passive.” He explained that defensive tactics of that nature are reserved for situations where the subject has killed or poses a threat of great bodily harm to the officer necessitating the officer’s use of deadly force.
Officer Samuel Davis (“Davis”), a seven- and-a-half year veteran of the NOPD assigned to the NOPD Training Academy, testified at the hearing on behalf of Byrd. Based upon his review of the video surveillance footage, it did not appear to him that Byrd executed a full-force punch when he struck Esmail leading him to believe that, although possibly unwarranted due to Es-mail’s passive resistance, Byrd’s actions under the circumstances were not excessive. According to Davis, the video showed Byrd trying to get around Esmail to handcuff him, but because of Esmail’s resistance, albeit passive, Byrd was unable to maneuver him into the proper position to even attempt the arm-bar technique or to secure the handcuffs. Davis conceded Byrd could have used techniques other than the stun-punch to gain compliance from Esmail, such as distancing himself from the subject, a wrist lock or using OC spray.
Byrd testified on his own behalf at the hearing and stated that prior to initiating the arrest, Esmail disregarded instructions to stay away from the tow truck, which was a part of the crime scene. Byrd described the crime scene as being very chaotic and that he, along with several other officers, were trying to restore order. When Esmail refused to comply with verbal instructions, Byrd advised him that he was being placed under arrest for interfering with an investigation. Byrd then attempted to grab Esmail’s hand into a wrist lock, but Esmail pulled away and spun around insisting that he was “not going to jail.” By spinning around and refusing to respond to Byrd’s repeated verbal commands, Byrd stated that he did not know if it was Esmail’s intention to throw a punch at him or not. Additionally, Byrd stated that while he had a Taser gun on his belt, because they were situated in a crowd close to the gas pumps and flammable materials, he determined it would have been unsafe to use the Taser gun in order to obtain Esmail’s compliance. Consequently, Byrd explained that he resorted to his academy training and chose to execute a “stun punch” to Esmail’s neck in order to distract him and get him handcuffed. Byrd further explained that because Esmail continued to pull away and spin around, the punch inadvertently landed in Esmail’s facial area rather than the *979 neck and did not work as intended.[7] Ultimately, it took the aid of several other officers to successfully secure Esmail’s arrest.
According to Byrd, Esmail’s resistance consisted solely of his body tensing up and verbally repeating that he did not want to go to jail. Byrd conceded that at no time did Esmail attempt to strike him in any fashion, nor did Esmail physically or verbally indicate any intention of fleeing the scene. Byrd also conceded that he could have requested assistance from other subordinate officers on the scene, but because his attention was focused solely upon the immediate threat of successfully securing Esmail and not on anyone else who may have been in the vicinity to assist him, he did not do so. Byrd further conceded that he was trained in hand-control techniques at the Training Academy, including the escort position, the arm-bar technique, and the reverse wrist lock, but stated that his last training in defense tactics occurred between 1998 and 2000, at which time he was not trained in any new technique.
The hearing examiner issued his report on 27 December 2011 stating that “[Byrd] was punished for doing his job in a manner that is no longer sanctioned by the Appointing Authority. While there may have been mitigating circumstances that the Appointing Authority could have taken into consideration, we cannot say that the Appointing Authority acted arbitrarily or abused its discretion.” The CSC reviewed the hearing examiner’s report, the transcripts of the hearing, and all documentary evidence, including the video surveillance footage. After its review, the CSC issued its decision on 13 April 2012 adopting the hearing examiner’s findings and affirming the suspension imposed upon Byrd by the appointing authority. From this decision, Byrd appealed, averring that the judgment of the CSC was contrary to the law and evidence.
II.
Employees with the permanent status in the classified civil service may be disciplined only for cause expressed in writing. La. Const., Art. X, § 8(A). New Orleans police officers are included in the protection guaranteed by this provision. Walters v. Dept. of Police of City of New Orleans, 454 So.2d 106, 112 (La.1984).
“Legal cause exists whenever an employee’s conduct impairs the efficiency of the public service in which the employee is engaged.” Cittadino v. Dept. of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir.1990). Disciplinary action against a civil service employee will be deemed arbitrary and capricious unless there is a real and substantial relationship between the improper conduct and the “efficient operation” of the public service. Newman v. Department of Fire, 425 So.2d 753, 754 (La.1983). Thus, the appointing authority must prove, by a preponderance of the evidence, the occurrence of the complained of activity and that the conduct did in fact impair the efficient and orderly operation of the public service. Id. See also Cure v. Dept. of Police, 07-0166, p. 2 (La.App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094, citing Marziale v. Dept. of Police, 06-0459, p. 10 (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 767.
Byrd timely exercised his constitutional right to an appeal from the appointing authority’s disciplinary action to the CSC. La. Const. Art. X, § 8(A). The CSC has “the exclusive power and authority to hear and decide all removal and disciplinary eases ...” La. Const. Art. X, § 12(B); *980 Pope v. New Orleans Police Dept., 04-1888 (La.App. 4 Cir. 4/20/05), 903 So.2d 1. Before the CSC, “the burden of proof on appeal, as to the facts, shall be on the appointing authority.” La. Const. Art. X, § 8(A); Walters, 454 So.2d at 112-113.
The CSC’s duty is to decide independently from the facts presented to it whether the appointing authority has good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed is commensurate with the infraction. Walters, 454 So.2d at 113-114. Although the CSC’s function is to effectuate the constitutional safeguards and protections for civil servants in the classified public service, equally important, according to the Louisiana Supreme Court, is “the appointing authority’s duty to undertake disciplinary action against an employee for legal cause that impairs the efficiency of the public service.” Mathieu v. New Orleans Public Library, 09-2746, p. 5 (La.10/19/10), 50 So.3d 1259, 1262.
The CSC’s decision is subject to appellate review on any question of law or fact, determining if its order was arbitrary, capricious, or characterized by an abuse of discretion. La. Const. Art. X, § 12(B); Barquet v. Dept. of Welfare, 620 So.2d 501, 505 (La.App. 4th Cir.1993); Cure, 07-0166, p. 2, 964 So.2d at 1095; Walters, 454 So.2d at 114. When no rational basis exists for the CSC’s action, its decision is arbitrary and capricious. Bannister v. Dept. of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647.
 The judicial review function in a matter appealed from a civil service commission is “multifaceted.” Walters, 454 So.2d at 113-114. We review the CSC’s procedural decisions and interpretations of law under our traditional plenary function of insuring procedural rectitude and reviewing questions of law de novo. Id. But, because of the constitutional implications arising from the distinct functions of the CSC and of us as a reviewing court, we are more circumspect in our review of other aspects of the CSC’s decision. Id. Thus, in reviewing the CSC’s findings of fact, the court should not reverse or modify such a finding unless it is clearly wrong or manifestly erroneous. Id.
Specifically, with respect to the issue raised by Byrd in this appeal, “[i]n judging the commission’s exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the court should not modify the commission’s order unless it is arbitrary, capricious, or characterized by abuse of discretion.” Id. In practice, we afford great deference to the CSC’s ruling supporting the decision of the appointing authority. See Serignet v. Dept. of Health, 08-0469, p. 10 (La.App. 4 Cir. 5/20/09), 15 So.3d 1019, 1025. Neither the CSC nor a reviewing court should “second-guess” an appointing authority’s decisions. See Lange v. Orleans Levee District, 10-0140, p. 17 (La.11/30/10), 56 So.3d 925, 936. The CSC and a reviewing court may intervene only when the appointing authority’s decisions are arbitrary and capricious or characterized by an abuse of discretion. Id. Moreover, neither the CSC nor the reviewing court may serve as a de facto pardon board. Id. “[S]ympathy is not a legal standard.” Id.
III.
Before addressing the merits of Byrd’s appeal, we first turn to the NOPD’s argument that the appeal should be dismissed on procedural grounds. The NOPD contends that Byrd’s application (i.e., notice) for appeal to this court failed to timely assert assignments of error of the CSC’s decision. Specifically, the *981 NOPD avers that Byrd’s application ^for appeal failed to separately and particularly set forth specific assignments of error.
Uniform Rules — Courts of Appeal, Rule 3-1.1, states, in pertinent part:
Every application for appeal from a final decision of any administrative body shall be filed with the appropriate administrative body in writing as required by law and shall include an assignment of errors, which shall set out separately and particularly each error asserted and a designation of the portions of the record,, desired to be incorporated into the transcript. Within 5 days after the filing of an application for appeal, any other party to the appeal may file a designation of additional portions of the record to be included for a proper review of the questions comprised within the assignment of errors. The administrative body shall transmit to a Court of Appeal, as a transcript of the record, only the portions of the record so designated. Costs for the inclusion of any unnecessary part of the record in any transcript may be assessed against the party requiring such inclusion. If by written stipulation filed with the administrative body, all parties agree on the portions of the record to be included in the transcript, only such portions shall be included. In all eases the application for appeal, the assignment of errors and the designation of the record shall be copied into the transcript. The administrative body shall certify the correctness of the transcript of the record.
In his brief, but not in his application for appeal, to this court, Byrd formally assigned as error that the CSC judgment “was arbitrary and capricious because its conclusion finds no support either in substantial evidence or in competent evidence; and that evidentiary lack failed to support legal cause for discipline, lacking the mandatory preponderance of evidence to support that judgment.”
First, we note that Byrd failed to particularly set forth any assignment of error in his application of appeal to the CSC, an administrative body. We note that the standard appeal form that the CSC provides to public employees to appeal a decision of the appointing authority to the CSC contains no space for the employee to assign errors committed by the appointing authority. Accordingly, we conclude that the CSC does not require a public employee to specifically assign and state an error committed by the appointing authority.
Although our Uniform Rule indicates that an application (ie., notice) of appeal of a decision to this court requires that the applicant assign errors, this rule is at odds and contrary to both statute and Louisiana Supreme Court jurisprudence.
In Rodrigue v. Rodrigue, 591 So.2d 1171 (La.1992), the Court stated:
Plaintiffs writ application is granted. The judgment of the court of appeal holding that Local Rule 22 of the Rules of the Thirty-Second Judicial District Court is not in conflict with the provisions of Louisiana Code of Civil Procedure article 1312 is hereby reversed.... The requirements of delivery or mailing of all pleadings under Local Rule 22 constitutes service under Code of Civil Procedure 1313. Article 1312 specifically exempts any pleading not required by law to be in writing from service. Code of Civil Procedure article 1701 provides that preliminary defaults may be obtained by oral motion in open court or by written motion. Since local rules of court cannot conflict with legislation, see Trahan v. Petroleum Cas. Co., 250 La. 949, 200 So.2d 6 (1967), Local Rule 22 of the Thirty-Second Judicial Dis *982 trict Court is hereby declared null and void to the extent it conflicts with Code of Civil Procedure article 1312. The judgment of default entered by the trial court is hereby reinstated. [Emphasis supplied.]
We note that La. C.C.P. art. 2129 does not require an appellant in this court to assign errors in his brief, while the Uniform Rules, Courts of Appeal, Rule 2-12.4 provide otherwise.[8] In light of the Supreme Court’s pronouncement in Ro-drigue, we cannot enforce it.
In Rocque v. Dept. of Health and Human Resources, Office of Secretary, 505 So.2d 726, 728 (La.1987), the Supreme Court held that summary dismissal of an appeal where the notice of appeal does not contain assignments of error “acts as a trap for the unwary appellant who does not learn of the insufficiency of his appeal ... until the time for remedying any deficiencies has already elapsed,” and is thus unreasonable and unduly burdensome on appellants. See La. Const. Art. X, § 8. Accordingly, we hold that an appellant in a civil service matter need not in his motion, application, or notice of appeal assign specific error(s) committed by the CSC.
IV.
In his next assignment of error, Byrd contends the CSC’s 13 April 2012 judgment was arbitrary and capricious because its conclusion is not supported by either substantial or competent evidence, and absent such preponderance of evidence to support the judgment, no legal cause for the discipline imposed upon him exists. Put simply, at issue is whether the actions taken by Byrd to secure the arrest of a non-compliant subject constituted an excessive use of force and unprofessional conduct that impaired the efficient operation of the police department.
After reviewing the appellate record, including Byrd’s verbal statement given to Stamp, the video surveillance footage of the incident, and the testimony of the witnesses presented before the hearing examiner, and in evaluating the CSC’s exercise of discretion in determining whether the disciplinary action imposed is based on legal cause and the punishment is commensurate with the infraction, we find a rational basis existed for the CSC’s decision, which is supported by substantial evidence. We find lawful cause was established through the testimony of Stamp, Badon, and Davis. After reviewing the video surveillance footage and conducting the investigation, Stamp concluded that Byrd’s use of force was excessive and merited both violations of moral conduct and professionalism. Though the NOPD received negative attention following media coverage of the incident, Stamp testified that this was not the motivating factor for Byrd’s suspension, but rather, his use of force was unprofessional whether or not captured in the public eye.
Both Badon and Davis testified that based upon their review of the video surveillance, Esmail’s conduct at the time of the arrest amounted to “passive,” as opposed to “active,” resistance, because he exhibited no physical threat towards Byrd. *983 According to Badon, the level of force used by Byrd (ie., the use of a striking technique) to gain control of a subject who was passively resisting was unauthorized and that there were other techniques taught by the NOPD, which Byrd admitted to have been trained in (ie., hands-on escort, reverse wrist lock, arm-bar technique) that Byrd could have used to overcome Es-mail’s passive resistance. Moreover, Ba-don explained that because of the potential for injury, the stun punch is no longer authorized by the NOPD, and defensive tactics of this nature (ie. force to the subject’s face) are reserved solely for extreme circumstances wherein the subject has either killed or poses a threat of great bodily harm to the arresting officer.
Additionally, Byrd admitted that the only resistance exhibited by Esmail was the tensing of his body and his repeated verbal intentions not to go to jail. Byrd conceded he could have requested assistance from subordinate officers in close proximity on the scene, but did not. Further, Byrd acknowledged his training in the use of defensive tactics to overcome passive resistance that did not include the use of a “stun punch” that he relied upon.
Based upon the testimony and our review of the video surveillance footage, we cannot say that the CSC’s conclusion — that because Esmail was not acting violently towards Byrd, Byrd’s use of force was excessive under the circumstances — is arbitrary and capricious or without just cause. Accordingly, we find the CSC correctly determined that legal caused existed for suspending Byrd “for doing his job in a manner that is no longer sanctioned by the Appointing Authority.”
Similarly, we find a real and substantial relation between Byrd’s conduct and the efficient operation of the NOPD. In the instant case, it was established that Byrd’s act of striking a passively resistant subject in the face was unjustified and violated the NOPD’s regulations on excessive force and professionalism. Such lack of professionalism serves to undermine the image and efficiency of the NOPD. The record reveals that at the time of the incident, a crowd of civilians were present at the scene bearing witness to Byrd striking Esmail in the head. The incident was televised to the public creating a negative image and causing embarrassment to the NOPD. At the very least, we find Byrd’s conduct in striking a subject who was not physically posing a threat to him, negatively affects the public’s perception of the NOPD and tends to suggest that police officers act violently towards passively resistant citizens, without provocation or justification. Such a negative perception hinders the relationship between the NOPD and the citizens they are bound to protect by creating distrust in and disapproval of the operation of public service. Based on our review of the record, we find the CSC correctly determined that Byrd’s actions were prejudicial to the public service and/or impaired the efficient operation of the NOPD.
Lastly, we find the discipline imposed upon Byrd by the NOPD and affirmed by the CSC was commensurate with his violation of departmental regulations. See Razor v. New Orleans Dept. of Police, 04-2002, p. 8 (La.App. 4 Cir. 2/15/06), 926 So.2d 1, 4. As noted previously, Rule IX, § 1, paragraph 1.1(5) of the Rules of the CSC provides that when a classified employee has committed an act to the prejudice of the service or otherwise has been subjected to corrective action, the appointing authority shall take action as warranted by the circumstances to maintain the standards of effective service. This action may include suspension without pay for a period not exceeding 120 days. See Staehle v. Dept. of Police, 98-0216, p. 6 *984 (La.App. 4 Cir. 11/18/98), 723 So.2d 1031, 1034, citing Rule IX, § 1.
We find the forty-day suspension imposed in the instant casé is both rationally based and commensurate to the dereliction. Byrd was given a thirty-day suspension for the excessive force violation and a ten-day suspension for violating rules against professionalism. In approving the appointing authority’s recommended penalty, Superintendent Serpas noted in his discipline letter to Byrd that at the CSC hearing when he was given an opportunity to explain his actions, Byrd “failed to offer any evidence ... which would tend to mitigate, justify, or explain his behavior.” Based upon the foregoing, we conclude the record evidence is sufficient to establish a rational basis for the punishment imposed upon Byrd.
CONCLUSION
For the foregoing reasons, the CSC’s decision denying Byrd’s appeal and affirming the discipline imposed by the appointing authority is affirmed.

AFFIRMED

. The investigation initially commenced as a criminal matter, i.e., a potential simple battery by Byrd on Esmail, but it was determined that Byrd’s actions did not rise to the level of a battery and the matter proceeded as an administrative investigation as to the possible use of excessive force.

. In the record on appeal, Sergeant Kevin Stamp is also referred to as Sergeant Kevin "Stamps.”

. NOPD Operations Manual, Rule 2: Moral Conduct, paragraph 6, provides:
Unauthorized Force
6. Employees shall not use or direct unjustifiable physical abuse, violence, force or intimidation against any person. [Emphasis in original.]

. NOPD Operations Manual, Rule 3: Professional Conduct, paragraph 1, provides:
1. Professionalism
Employees shall conduct themselves in a professional manner with the utmost concern for the dignity of the individual with whom they are interacting. Employees shall not unnecessarily inconvenience or demean any individual or otherwise act in a manner which brings discredit to the employee or the Police Department. [Emphasis in original.]

. Excessive force is defined by Chapter 1.2 of the NOPD Operations Manual as:
Force is excessive when its application is illegal, inappropriate, or unreasonable under the circumstances. The force may result in serious injury or death to the suspect, but this is not absolutely necessary for the force to be excessive. No single objective definition of excessive force can be offered, rather each situation must be evaluated according to its particular circumstances and within the guidelines established herein.
Chapter 1.2 (1) of the NOPD Operations Manual provides, in pertinent part, that "Police Officers may use reasonable force to compel obedience to a valid police order or to protect persons or property from illegal harm."
1.2 (2) provides:
The legal right to use force is contingent upon the reasonableness of the act. The *977 concept of reasonableness is applied in two ways:
a. The need to resort to force to accomplish a lawful police objective must be reasonable. That is, if another alternative, such as verbal persuasion, would reasonably be expected to be effective under the circumstances, and this alternative was not attempted, the use of force is not legal.
b. The degree of force used must be reasonable. The officer may only use enough force to overcome the amount of resistance or aggression met. When such resistance or aggression is reduced, the officer must correspondingly and immediately reduce the degree of force he is applying, or the use of force is not legal.

. An escort position is where a police officer takes control of a person's arm on either side of his body and moves him from point A to point B.

. Byrd testified that it was not his intention to injure the subject, but rather, his goal was to obtain his compliance with the lawful arrest for interfering with a police investigation.

. Rule 2-12.4 states, in pertinent part:
The brief of the appellant or relator shall set forth the jurisdiction of the court, a concise statement of the case, the ruling or action of the trial court thereon, a specification or assignment of alleged errors relied upon, the issues presented for review, an argument confined strictly to the issues of the case, free from unnecessary repetition, giving accurate citations of the pages of the record and the authorities cited, and a short conclusion stating the precise relief sought. [Emphasis supplied.]
See also Uniform Rules — Courts of Appeal, Rule 3-1.5.