990 So.2d 54 (2008)
Sharon HARRIS, Yolanda White, Letitia Joseph, Bonita Brackins, June F. Taylor, Claudette Adams, Adrina Houston, Diana Jones
v.
DEPARTMENT OF FIRE.
No. 2008-CA-0514.
Court of Appeal of Louisiana, Fourth Circuit.
July 16, 2008.
*56 Brett J. Prendergast, New Orleans, LA, for Plaintiffs/Appellees.
Victor L. Papai, Jr., Assistant City Attorney, Penya Moses-Fields, City Attorney, Nolan P. Lambert. Chief Deputy City Attorney, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III).
PATRICIA RIVET MURRAY, Judge.
This is a civil service case. The Department of Fire (the "Department") suspended eight of its employees for failing to timely return to work following Hurricane Katrina. The City Civil Service Commission (the "Commission") granted the employees' consolidated appeals and ordered the Department to restore all pay and emoluments the employees lost as a result of the suspensions. From that decision, the Department appeals. For the reasons that follow, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
On August 29, 2005, the date Hurricane Katrina struck the City of New Orleans (the "City"), the eight suspended employees were employed as dispatchers in the Department's Fire Alarm division ("Fire Alarm").[1] Three of the DispatchersBonita Brackins, Sharon Harris, and Letitia Josephwere on approved leave at the time the hurricane struck. They evacuated the City on their own. Five of the DispatchersYolanda White, Claudette Adams, Adrina Houston, Diana Jones, and June Taylorreported for duty and worked through the hurricane. Because their base of operations flooded, they were evacuated to Delgado Community College. On August 31, 2005, the Communications Supervisor, Peter Caruso, and the Deputy Chief of Administration, Bruce Martin, decided to evacuate the Dispatchers to Baton Rouge. To do so, they evacuated *57 the Dispatchers by boat from Delgado to the interstate. They then divided them into two groups. One group went to Baton Rouge by bus; the other group, joined by Mr. Caruso, went by van. At that time, the Dispatchers were not given any instructions regarding returning to work. Rather, they were told that they were on their own.
Sometimes thereafter the Department declared September 22, 2005, as the last day that an employee could return to work after Hurricane Katrina without being subject to disciplinary action. It is undisputed that the Department did not affirmatively communicate the September 22, 2005, return date to the Dispatchers. Because the Dispatchers did not return to work until October 2005, they were each charged with violating the following two department rules:
Section 7.1.1All officers and members shall acquire a general knowledge of and comply with the Rules and Regulations, S.O.P.'s, Policies, Training Bulletins and any other directives as applicable to their respective Divisions, and classifications.
Section 9.1.5Members must adhere to Departmental policy when requesting emergency annual leave. Emergency annual leave is not automatic, members must be properly granted the leave from Headquarters.
Each of the Dispatchers appeared before a Department Peer Review Board for a hearing. Following the Board's review, the Superintendent of Fire, Charles Parent, reviewed the cases and suspended each of the Dispatchers. In disciplining the Dispatchers, Superintendent Parent considered neither the Dispatchers' tenure nor their lack of a disciplinary record. The suspensions he imposed on the Dispatchers ranged from thirty to ninety days as shown in the following table:

------------------------------------------------------------------------
 Dispatcher Return Date Duty/Leave Tenure Suspension
------------------------------------------------------------------------
Bonita Brackins October 13, 2005 On Leave 23 years 90 days
------------------------------------------------------------------------
Sharon Harris October 2, 2005 On Leave 22 years 30 days
------------------------------------------------------------------------
Letitia Joseph October 3, 2005 On Leave 6 years 90 days
------------------------------------------------------------------------
Yolanda White October 6, 2005 On Duty Over 30 years 90 days
------------------------------------------------------------------------
Claudette Adams October 23, 2005 On Duty 30 years 90 days
------------------------------------------------------------------------
Adrina Houston October 10, 2005 On Duty 23 years 90 days
------------------------------------------------------------------------
Diana Jones October 14, 2005 On Duty Unknown 90 days
------------------------------------------------------------------------
June Taylor October 26, 2005 On Duty 22 years 60 days
------------------------------------------------------------------------

The Dispatchers appealed their suspensions to the Commission. The Commission appointed a Hearing Examiner pursuant to La. Const. Art. X, § 12. Due to the similarity of the charges, the Dispatchers' appeals were consolidated.
On March 28, 2006, a hearing was held at which ten witnesses testified: the eight Dispatchers, Mr. Caruso, and Superintendent Parent. Their testimony is summarized below.

i) Bonita Brackins
Ms. Brackins was on approved annual leave at the time Hurricane Katrina struck. She was not scheduled to return to work until Tuesday, August 30, 2005. On Friday, August 26, 2005, Ms. Brackins, her disabled husband, and her two children (then ages thirteen and sixteen) traveled to Dallas, Texas to attend her daughter's volleyball game. On Sunday, August 28, 2005, Ms. Brackins spoke with the Assistant Supervisor of Communication, Tom *58 Levy, who advised her that she would not be able to return to the City because of the mandatory evacuation and the contraflow.
On September 9, 2005, Ms. Brackins again spoke with Mr. Levy. She informed him that she had a Department vehicle with a full tank of gas parked in the driveway of her house on the Westbank. After retrieving the vehicle, Mr. Levy called Ms. Brackins and informed her that the roof and chimney of her house were damaged. Ms. Brackins asked him whether the airlines were operational and whether someone could come to get her in Dallas. His answer to both of those questions was no.
In September 2005, Ms. Brackins spoke with Mr. Caruso, and he instructed her to return to work when she could. On October 4, 2005, she again spoke with Mr. Caruso and told him that she had leased an apartment in Dallas for her husband and children, that she had enrolled her children in school in Dallas, and that she could return to work. She testified that she complied with the instruction to return to work when she could by reporting for work on October 12, 2005.

ii) Sharon Harris
Ms. Harris was on approved sick leave at the time Hurricane Katrina struck. She was scheduled to return to work on September 1, 2005. Ms. Harris, a single mother of two children (then ages twelve and nineteen), evacuated with her children to Shreveport. She attempted to contact the Department by telephone, but the telephones were not working. About two weeks after evacuating, she saw a contact number for Department personnel on the television. When she called that number, she spoke with Captain Jeffery Clark,[2] who informed her that Fire Alarm was on the Westbank at Woodland and that they really needed dispatchers. He instructed her to "come back as soon as you can" and to "get yourself together." She interpreted his instructions to mean that she should prepare to come back. Following those instructions, Ms. Harris focused her efforts on getting her children enrolled in school and making arrangements for her sister-in-law to take custody of the children so that she could return to work. Ms. Harris testified that she tried on multiple occasions to reach Mr. Caruso, but was unable to do so. On October 1, 2005, she registered for housing the City made available to its employees on a cruise ship. She began work the next day.

iii) Letitia Joseph
Ms. Joseph was on approved sick leave when Hurricane Katrina struck. She, a single mother of two children (then ages thirteen and fifteen), evacuated with her children first to Memphis, Tennessee, where she stayed for three days, and then to St. Francisville, where she stayed for a while with a relative. In mid-September, Ms. Joseph spoke with another dispatcher who informed her that Fire Alarm was operating at Woodland.
On September 12, 2005, Ms. Joseph rode with a relative to the City. She testified that the purpose of her trip was to secure her job. On that day, she went to Woodland where she spoke with Mr. Caruso. She advised him that she needed to enroll her children in school and that she would return to work in about two weeks. Mr. Caruso voiced no objection to her delay in returning to work; rather, he stated that "we'll be glad to have you back whenever *59 you can get back." While she was in the City, Ms. Joseph registered for housing on the cruise ship so that she would have a place to stay when she returned.[3] She denied being told to report to work the next day.

iv) Yolanda White
Ms. White testified that on August 31, 2005, when they were waiting on the interstate to be transported to Baton Rouge, Chief Martin told them that "[w]e are in Jefferson Parish, you are now off the clock and you are on your own." On that day, Ms. White rode to Baton Rouge in the van with Mr. Caruso. During that time he did not give any instructions regarding returning to the City. Upon reaching Baton Rouge, Ms. White contacted friends who brought her to Opelousas. Thereafter, she evacuated to Houston, Texas.
On September 24, 2005, Ms. White spoke with the dispatcher on duty who informed her that she and the other dispatchers were on annual leave and that they should get back as soon as they could. Ms. White informed the dispatcher that she was sick (suffering from anxiety and exhaustion) and requested sick leave. No objection was voiced to her request for sick leave. On October 6, 2005, Ms. White reported to Woodland and registered for housing on the cruise ship.[4] On October 8, 2005, she was first scheduled for work.

v) Claudette Adams
Claudette Adams evacuated from Baton Rouge to her daughter's house in Cincinnati, Ohio. She spent the first two weeks after evacuating locating her husband and mother, who were in the City when the hurricane struck. After finding them, she contacted another dispatcher, Sharon Harris, who gave her a phone number to contact the Department. She also found a contact phone number in a Cincinnati newspaper. When Ms. Adams contacted Mr. Caruso, she explained that she was trying to get her family together and that she had a death in the family. Mr. Caruso voiced no objection to Ms. Adams' delay in returning to work. Rather, he told her "take care of your family members" and "get back when you can." In October 2005, Ms. Adams spoke to the dispatcher on duty and requested sick leave (she was under a doctor's care). No objection was voiced to her request. On October 23, 2005, Ms. Adams returned to work.

vi) Adrina Houston.
Ms. Houston was in a boat that sank during the evacuation from Delgado. As a result, her cell phone was ruined. She evacuated from Baton Rouge to Thibodaux. Two weeks later, she evacuated to St. Francisville. The only telephone number Ms. Houston knew was for Fire Headquarters, which she had memorized. Ms. Houston unsuccessfully attempted to call that number. She also called the information line for City employees and provided them with her contact information; however, no one returned her call. Ms. Houston first returned to the City when Mayor Ray Nagin indicated that people living in her zip code could return, which was on October 4 or 5, 2005. On October 10, 2005, she reported to Woodland and was placed on the work schedule for the next day.

*60 vii) Diana Jones
Ms. Jones was on the boat with Ms. Houston that sank during the evacuation from Delgado. According to Ms. Jones, she was forced to evacuate by her supervisors even though she wanted to remain in the City to work. She evacuated from Baton Rouge to Plaquemine. On October 4, 2005, she spoke with the dispatcher on duty who told her that the rules were changing everyday and that she should return to work "whenever ready to do so." She left a message for Mr. Caruso, but he never returned her call. She knew that Fire Alarm was operating at Woodland. She returned to work on October 14, 2005, after being ordered to attend a hearing on that date.

viii) June Taylor
Ms. Taylor evacuated from Baton Rouge to Rapides Parish (Alexandria) with her family. On September 14, 2005, Ms. Taylor drove a rental car to the City to tow her vehicle, which was still parked at Delgado, back to Alexandria. While in the City, she registered for housing on the cruise ship; however, she never stayed on the ship.[5] On September 18, 2005, Ms. Taylor left a message on Mr. Caruso's voice mail advising him that she would return to work on September 23, 2005, she indicated that she needed to have her vehicle repaired. On September 22, 2005, Mr. Caruso called her back. Ms. Taylor advised him that due to the threat posed by Hurricane Rita she had to evacuate her mother to Dallas and that she would return to work once that emergency was over. Mr. Caruso did not voice any objection to her delay in returning to work; rather, he told her to return as soon as she could.
On September 27, 2005, Ms. Taylor returned to Alexandria and found that the place she had been residing there had suffered wind damage as a result of Hurricane Rita. During that time period, Ms. Taylor became sick and commenced medical treatment in Alexandria. On October 3, 2005, Ms. Taylor contacted Fire Alarm and requested sick leave. No objection was voiced to her request. At the hearing, the parties stipulated that Ms. Taylor had a doctor's excuse from October 3 through October 21, 2005, when she was released from the doctor's care. On October 22, 2005, she reported to Woodland. On October 26, 2005, she was first put on the work schedule.

ix) Peter Caruso
Mr. Caruso, the Dispatchers' direct supervisor, testified that when he evacuated to Baton Rouge with the Dispatchers on August 31, 2005, he left his cell phone number with the Firefighters' Union office. According to Mr. Caruso, the Union office posted his cell phone number on its phone voice message. He testified that on September 12, 2005, he returned to the City to work. Mr. Caruso could not recall any specifics regarding the Dispatchers who contacted him after they evacuated; he could only testify in general as to the conversations he had with them. Generally, he testified that he informed them that Fire Alarm was operating at Woodland and that they needed to return to work. He admitted that he did not provide them with any timetable for a mandatory return to work. He also admitted that he was unaware of the September 22, 2005, return date until after the fact. Mr. Caruso testified that it was not his responsibility to order the Dispatchers to return; rather, *61 he testified that "[i]f you are essential, your duty is to come back."

x) Superintendent Charles Parent
Superintendent Parent acknowledged that no efforts were made to learn the whereabouts of evacuated employees or to contact absent employees. Instead, he testified that information regarding the timetable for returning to work was provided to the dispatchers on duty and to the Firefighters' Union office. Superintendent Parent testified that the Department needed every dispatcher at this critical time and that no one was excused from duty because of the hurricane. He explained that because he anticipated there would be future emergencies he felt it was important that the Dispatchers understand their responsibilities as first responders. He testified that he considered the Dispatchers' individual circumstances as mitigating factors by not terminating any of them.
Following the hearing, the Commission granted the Dispatchers' appeals and restored all pay and emoluments lost as a result of the suspensions. This appeal by the Department followed.

DISCUSSION
The legal standards governing this dispute are well-settled and can be summarized as follows:
 An employer cannot subject a permanent classified civil service employee to disciplinary action except for cause expressed in writing. La. Const. Art. X, § 8(A); Walters v. Dep't. of Police, 454 So.2d 106, 112 (La.1984).
 Cause for discipline of an employee exists whenever the employee's conduct impairs the efficiency of the public service in which the employee is engaged. Cittadino v. Dep't. of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir. 1990).
 "The appointing authority is charged with the operation of his or her department and it is within his or her discretion to discipline an employee for sufficient cause." Whitaker v. New Orleans Police Dep't., 03-0512, p. 5 (La.App. 4 Cir. 9/17/03), 863 So.2d 572, 575.
 The employee may appeal from such a disciplinary action to the Commission. On appeal, the Commission has a duty to decide independently from the facts presented whether the appointing authority had good and lawful cause for taking the disciplinary action and, if so, whether the punishment imposed was commensurate with the infraction. Walters, 454 So.2d at 113.
 "The authority to reduce a penalty can only be exercised if there is insufficient cause." Whitaker, 03-0512 at p. 4, 863 So.2d at 575 (citing Branighan v. Dep't. of Police, 362 So.2d 1221, 1223 (La.App. 4 Cir.1978). Further, a legal basis for any change in a disciplinary action can only be that sufficient cause for the action was not shown by the appointing authority. Branighan, 362 So.2d at 1221. The Commission may not merely substitute its judgment for the appointing authority's judgment. Whitaker, 03-0512 at p. 5, 863 So.2d at 576.
 On appeal, the standard of review is established by the constitutional rule that the Commission's decision is subject to review on any question of law or fact. La. Const. art. X, § 12. A multifaceted standard of appellate review applies. First, as in other civil matters, deference must be given to the Commission's factual findings, which should not be disturbed unless manifestly erroneous or clearly wrong. Second, in evaluating the Commission's determination as to whether the disciplinary action is both *62 based on legal cause and commensurate with the infraction, the appellate court should not modify the Commission's decision unless it is arbitrary, capricious, or characterized by an abuse of discretion. Bannister, 95-404 at p. 8, 666 So.2d at 647. Arbitrary or capricious means there is no rational basis for the action taken by the Commission. Id.

Applying these principles, an appellate court must determine two factors: (1) whether the appointing authority had good or lawful cause for taking the disciplinary action, and (2) whether the punishment imposed is commensurate with the offense. Staehle v. Dep't. of Police, 98-0216, p. 3 (La.App. 4 Cir. 11/18/98), 723 So.2d 1031, 1033. To establish that it had good or lawful cause the Department must satisfy a two-pronged burden of proof: (i) prove that the complained of conduct occurred, and (ii) prove that the conduct impaired the efficiency of the Department. Id
In this case, the complained of conduct was the Dispatchers' failure to return to work before the September 22, 2005, return date. It is undisputed that the complained of conduct occurred. Thus, the issue we must address is whether the Department proved the Dispatchers' conduct impaired the efficiency of the Department. Answering that question in the negative and finding the Department failed to establish a punishable offense, the Commission reasoned as follows:
[I]n the chaotic aftermath of this storm, having seen their normal base of operations flooded, these employees were told by their supervisor that "you're on your own" after they were bussed [(sic)] out of town, told only to "return when you can." Under these circumstances, the application of a specific deadline, which was established long after the evacuation and never affirmatively communicated to the employees, cannot in itself justify disciplinary action. No evidence whatsoever was offered to show that the Fire Department failed to complete any task, could not communicate or failed in any way to carry out its duties effectively. Thus no impairment of the public service has been shown.
In its decision, the Commission faulted the Department for its reliance on the Firefighters' Union as a means of providing notice to the Dispatchers, stating:
The Fire Department by tradition is said to operate as a quasi-military institution. The first principle of any military organization is the responsibility of senior officers to maintain an effective chain of command providing clear direction to those subordinate in the chain. The Firefighters' Union is clearly not a part of the department's chain of command, and these dispatchers are not members of that organization; reliance on the union to provide critical job-related information, especially to non-members, was neither reasonable nor effective.
On appeal, the Department contends that a review of the facts surrounding each of the Dispatchers' delay in returning to work establishes that the Commission's finding of no legal cause was manifestly erroneous. The Department further contends that the Commission erred in finding it failed to establish an impairment of the public service. The Department emphasizes that the Dispatchers were essential personnel and that their presence on the job during this critical time was needed. In support of its position, the Department cites the testimony of Superintendent Parent that the Dispatchers' absence from work had a negative impact on the efficient operation of the Department in two respects. First, the dispatchers who returned had to work extensive overtime. Second, although New York firefighters *63 also were used as dispatchers, the New York firefighters were unfamiliar with the Department's terminology and unfamiliar with the City's geographical layout.
The Dispatchers, on the other hand, contend that there is a rational basis for the Commission's decision in their favor. Although the Dispatchers acknowledge that it is arguable whether the Department had a duty to notify them of the September 22, 2005, return date, they emphasize that it is not arguable that the Department had a duty to provide its employees with accurate information and instructions.
The Dispatchers further contend that the Commission's decision in their favor is supported by this court's recent decision in Fuller v. Department of Fire, 07-0369 (La. App. 4 Cir. 9/19/07), 968 So.2d 731. The Fuller case involved two other dispatchers who the Department suspended for failing to return to work by the September 22, 2005, return date. One of the dispatchers was on duty at the time Hurricane Katrina struck; the other dispatcher was on approved leave. In that case, the Commission affirmed the Department's decision suspending the two dispatchers. Reversing the Commission, this court reasoned that application of the return date uniformly to all dispatchers was arbitrary and capricious given the "monumentally abnormal" circumstances following Hurricane Katrina. Fuller, 07-0369 at p. 5, 968 So.2d at 734.
In the instant case, the Commission reversed the Department's decision suspending the Dispatchers. Having reviewed each Dispatchers' circumstances, we cannot say that the Commission's factual finding that each of them complied with the only instruction she received and returned when she could was manifestly erroneous. Indeed, the Department failed to present any evidence to the contrary. Although the complained of conduct in this case would satisfy the burden of establishing legal cause for disciplinary action under ordinary circumstances, the circumstances the Dispatchers faced in the aftermath of Hurricane Katrina were anything but ordinary. Accordingly, we find the Commission's decision that the Department failed to prove sufficient legal cause for disciplining the Dispatchers is not arbitrary, capricious, or an abuse of discretion.

DECREE
For the foregoing reasons, the judgment of the City Civil Service Commission is affirmed.
AFFIRMED.
NOTES
[1] For ease of discussion, the eight employees at issue in this appeal are referred to herein collectively as "the Dispatchers."
[2] Captain Clark was an officer that Superintendent Parent assigned to disperse information.
[3] The disciplinary letter issued to Ms. Joseph states that one of the reasons that she was being disciplined was that she had registered on September 12, 2005, for housing the City had made available to her on the Sensation Cruise Ship.
[4] The disciplinary letter issued to Ms. White states that one of the reasons that she was being disciplined was that she had registered on October 6, 2005, for housing the City had made available to her on the Sensation Cruise Ship.
[5] The disciplinary letter issued to Ms. Taylor states that one of the reasons that she was being disciplined was that she had registered on September 14, 2005, for housing the City had made available to her on the Sensation Cruise Ship.