JOSEPH WAGUESPACK     *     NO. 2022-CA-0270

VERSUS     *

            COURT OF APPEAL

NEW ORLEANS POLICE     *
DEPARTMENT             FOURTH CIRCUIT

    *

            STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CITY CIVIL SERVICE COMMISSION ORLEANS
NO. 9301
JAY GINSBERG, HEARING OFFICER
* * * * * *
**JAMES F. MCKAY III**
**JUDGE PRO TEMPORE**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Joy Cossich Lobrano, Judge
Pro Tempore James F. McKay III)

**LOBRANO, J., CONCURS IN THE RESULT**

ROGER W. JORDAN, JR.
829 Baronne Street
New Orleans, Louisiana 70113
      COUNSEL FOR PLAINTIFF/APPELLANT

RENEE GOUDEAU
ASSISTANT CITY ATTORNEY
ELIZABETH S. ROBINS
DEPUTY CITY ATTORNEY
KEVIN HILL
SENIOR CHIEF DEPUTY CITY ATTORNEY
DONESIA TURNER
CITY ATTORNEY
1300 Perdido Street, Room 5E03
New Orleans, Louisiana 70112
      COUNSEL FOR DEFENDANT/APPELLEE

                  **AFFIRMED**

             **NOVEMBER 30, 2022**

This is a civil service case. Appellant-Plaintiff, Joseph Waguespack ("Capt. Waguespack"), appeals the February 14, 2022 decision of the Civil Service Commission ("CSC" or "Commission"), which affirmed the five day suspension imposed against him by the New Orleans Police Department ("NOPD"). For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Capt. Waguespack is a police captain with permanent status with the NOPD. The discipline at issue arises from Capt. Waguespack's disclosure of information to the news media without authorization in March of 2021.

The record provides that in 2005, Capt. Waguespack became the head of the homicide division of the NOPD. In this role, in January 2006, Captain Timmy Bayard asked Capt. Waguespack to review the death of Joseph Georgusis, Jr. ("Joey Georgusis"), which occurred on August 5, 2005. The death was classified by the Orleans Parish Coroner, Dr. Frank Minyard ("Dr. Minyard"), as an overdose and the NOPD concurred with this finding.

Later, the father of the deceased, Joseph Georgusis, Sr. ("Georgusis"), met with Capt. Waguespack at his Katrina-damaged home and said it would be worth $100,000.00 to Georgusis if his son's death was classified as a homicide. In 2006, Dr. Minyard advised Capt. Waguespack that Georgusis also offered to pay him $100,000.00 to reclassify his son's death.

Joey Georgusis's death was the subject of heavy media coverage. The record indicates that at some point Georgusis filed a civil suit seeking a reclassification of his son's death, claiming he was murdered and alleged wrongdoing/conspiracy on the behalf of law enforcement agencies.

In March of 2021, a reporter for *The Advocate*, Gordan Russell ("Russell"), called Capt. Waguespack to ask him to confirm his conversation with Georgusis and Dr. Minyard's conversation with Georgusis. Capt. Waguespack spoke briefly to the reporter and did confirm these conversations. Thereafter, NOLA.com published an article on March 8, 2021, which stated that Capt. Waguespack corroborated the "bribe" Georguisis proffered to Dr. Minyard and also personally received a request from Georgusis to classify his son's death as a homicide.[1]

---

[1] The article, entitled *Feud between two St. Bernard titans heats up*; *allegations of bribes, murder cover-up traded*, provided, in pertinent part:

> According to Stephens, a close friend of Minyard's until his death in September, the elder Georgusis offered the coroner $100,000 to make a murder case from what police and pathologists had deemed an overdose.
>
> Capt. Joe Waguespack, a longtime New Orleans police officer who was also close to Minyard, says the late coroner told him the same story of a proffered bribe. Waguespack, who was head of the NOPD's homicide squad at the time and investigated Joey Georgusis' [sic] death as a potential murder as a favor to the grieving father, says he, too, received what he thought was an indecent proposal from Georgusis.
>
> "He said to me, 'If this was a murder and it was solved, it would be worth $100,000 to me,'" Waguespack recounted. "I cut him off right there and said if it was a murder, we'd solve it and someone would go to prison, and he didn't need to pay anyone.

Subsequently, Lee Zurik ("Zurik') of Channel 8 requested an interview from Capt. Waguespack, who then referred Zurik to the NOPD Public Information Officer ("PIO"), Gary Sheets. The NOPD ultimately denied Zurik's request for an interview.

Following a pre-discipline hearing, the NOPD advised Capt. Waguespack on August 4, 2021, that he was suspended for five days for violating departmental Rule 6: Official Information; Paragraph 3(b) Public Statements and Appearances. The Rule provides, in pertinent part:

> *Employees shall not* address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or periodical, *release or divulge* investigative information, or *any other matters of the Department without official sanction or proper authority.* Employees may lecture on police or other related subjects only with the prior approval of the Superintendent of Police.

(emphasis added). Capt. Waguespack thereafter appealed his suspension to the CSC.

A hearing on Capt. Waguespack's appeal was held before the CSC on September 30, 2021. Thereafter, the hearing examiner submitted a report recommending that the appeal be denied and the five day suspension be sustained.[2] The CSC rendered its decision on February 14, 2022, and denied Capt. Waguespack's appeal.

This appeal follows.

## DISCUSSION

On appeal, Capt. Waguespack argues that the CSC erred in denying his appeal and finding that he violated Rule 6 Paragraph 3(b) in his conversation with Russell because the statement provided and reported was not on "any other matters

---

[2] The record reflects that Jay Ginsberg was the hearing examiner.

of the department" and that any such finding is vague and an overly broad construction of the Rule.

**Standard of Review and Legal Principles**

This Court has summarized the standard of review and legal principles governing civil service cases, as follows:

- An employer cannot subject a permanent classified civil service employee to disciplinary action except for cause expressed in writing. La. Const. Art. X, § 8(A); *Walters v. Dep't of Police*, 454 So.2d 106, 112 (La. 1984).

- Cause for discipline of an employee exists whenever the employee's conduct impairs the efficiency of the public service in which the employee is engaged. *Cittadino v. Dep't of Police*, 558 So.2d 1311, 1315 (La. App. 4[] Cir. 1990).

- "The appointing authority is charged with the operation of his or her department and it is within his or her discretion to discipline an employee for sufficient cause." *Whitaker v. New Orleans Police Dep't*, [20]03-0512, p. 5 (La. App. 4 Cir. 9/17/03), 863 So.2d 572, 575.

- The employee may appeal from such a disciplinary action to the Commission. On appeal, the Commission has a duty to decide independently from the facts presented whether the appointing authority had good and lawful cause for taking the disciplinary action and, if so, whether the punishment imposed was commensurate with the infraction. *Walters*, 454 So.2d at 113.

- "The authority to reduce a penalty can only be exercised if there is insufficient cause." *Whitaker*, [20]03-0512 at p. 4, 863 So.2d at 575 (citing *Branighan v. Dep't of Police*, 362 So.2d 1221, 1223 (La. App. 4 Cir. 1978)). Further, a legal basis for any change in a disciplinary action can only be that sufficient cause for the action was not shown by the appointing authority. *Branighan*, 362 So.2d at 1221. The Commission may not merely substitute its judgment for the appointing authority's judgment. *Whitaker*, [20]03-0512 at p. 5, 863 So.2d at 576.

4

- On appeal, the standard of review is established by the constitutional rule that the Commission's decision is subject to review on any question of law or fact. La. Const. art. X, § 12. A multifaceted standard of appellate review applies. First, as in other civil matters, deference must be given to the Commission's factual findings, which should not be disturbed unless manifestly erroneous or clearly wrong. Second, in evaluating the Commission's determination as to whether the disciplinary action is both based on legal cause and commensurate with the infraction, the appellate court should not modify the Commission's decision unless it is arbitrary, capricious, or characterized by an abuse of discretion. *Bannister [v. Department of Streets]*, [19]95-404 at p. 8, 666 So.2d [641] at 647 [(La. 1996)]. Arbitrary or capricious means there is no rational basis for the action taken by the Commission. *Id.*

*Jenkins v. New Orleans Police Dep't,* 2022-0031, pp. 3-4 (La. App. 4 Cir. 6/22/22), 343 So.3d 238, 241 (quoting *Abbott v. New Orleans Police Dep't*, 2014-0993, pp. 7-8 (La. App. 4 Cir. 2/11/15), 165 So.3d 191, 197).

"In applying these standards, an appellate court must make two determinations: (1) whether the appointing authority had good or lawful cause for taking the disciplinary action, and (2) whether the punishment the appointing authority imposed is commensurate with the offense." *Jenkins*, 2022-0031, p. 5, 343 So.3d at 241 (quoting *Abbott*, 2014-0993, p. 8, 165 So.3d at 197).

**Lawful Cause**

Three witnesses testified at the hearing: Capt. Waguespack; Captain Frank Young ("Capt. Young"), who investigated the complaint; and Assistant Superintendent Paul Noel ("Asst. Supt. Noel"), who conducted the pre-disciplinary hearing.

Multiple exhibits were also offered at the hearing, including: a letter dated August 4, 2021, advising Capt. Waguespack he was suspended; the Nola.com

article, dated March 8, 2021, entitled *Feud between two St. Bernard titans heats up*; *allegations of bribes, murder cover-up traded*; email correspondence relating to Zurik's request for interview; the July 21, 2021 disciplinary hearing disposition; and Rule 6.

Capt. Waguespack testified that he was the head of homicide in December 2005. He stated that Joey Georguisis's death was classified as an overdose by the coroner and that the NOPD agreed with this finding. Capt. Waguespack admitted that he was aware Russell was a reporter and that he had previously reported on Joey Georgusis's death. He also admitted that Joey Georgusis's death was a high profile matter and received extensive media attention.

Capt. Waguespack testified that he spoke with Russell on the telephone in March of 2021. He stated that Russell asked him to verify that Georgusis had offered Dr. Minyard and him $100,000.00. He also testified that he told Russell that Georgusis came to his home after Hurricane Katrina and said that if his son's death "is a homicide and it can be solved, it would be worth $100.000.00 to me." Capt. Waguespack acknowledged that subsequently his responses were cited in an article authored by Russell. The article stated that Capt. Waguespack corroborated the "proffered bribe" to Dr. Minyard and also received an "indecent proposal" from Georgusis. Capt. Waguespack stated that the article was not accurate.

Capt. Waguespack testified that he was aware of the NOPD policy requiring obtaining permission prior to making a statement to the media that pertains to anything dealing with the police department, any ongoing investigation, or anything political. He did not believe answering questions about a private conversations fifteen years prior would qualify as a "matter of the department" as stated in the rule, and thus would not constitute a violation. Capt. Waguespack said

6

that the conversation he had with Georgusis did not pertain to any witnesses or evidence and it was not involved with the ultimate determination that the death was an overdose. Capt. Waguespack, however, acknowledged Georgusis had filed a civil suit regarding the classification of his son's death. Capt. Waguespack stated that he considered Zurik's request to speak with him differently because he wanted an on-air interview and referred him to the PIO, Gary Sheets ("Sheets").

Capt. Young testified that in conducting his investigation he interviewed Capt. Waguespack and Sheets. He also reviewed the news article and the emails between Zurik and Sheets. Capt. Young noted that Zurik's complaint that the NOPD was favoring *The Advocate* and Russell over him prompted the investigation of Capt. Waguespack. He testified that Sheets advised him that Capt. Waguespack did not obtain permission to speak with Russell. Capt. Young said Capt. Waguespack admitted to answering questions from Russell regarding private conversations with Georgusis. He opined that Capt. Waguespack's statements to Russell constituted an official departmental matter under Rule 6 because it pertained to the investigation of Joey Georgusis's death and as a result sustained the violation. Capt. Young also noted because Capt. Waguespack was an investigator he was "potentially a witness in court" on the case and that he was offered the $100,000.00 because of his position with the NOPD.

Asst. Supt. Noel testified that he conducted Capt. Waguespack's disciplinary hearing. He stated that the death of Joey Georgusis and Georgusis's questioning the acts of law enforcement was subject to heavy media coverage. Asst. Supt. Noel testified that the coverage by the press at the time is partially why Capt. Waguespack's conversation with Russell was considered a matter of the department. He stated that because Russell's questions concerned NOPD business,

7

Capt. Waguespack should have consulted with the PIO. Asst. Supt. Noel testified that the PIO is responsible for coordinating media communications to make sure the information is accurate and consistent.

He stated that the NOPD uses a disciplinary matrix/penalty schedule to discipline employees in order to give consistent and fair penalties. It also gives the ability to mitigate down or aggravate up based on the circumstances. Asst. Supt. Noel stated a violation of Rule 6 is a Level D violation. He stated that the lower penalty is five days, the presumptive penalty is ten days, and the maximum is twenty days. Asst. Supt. Noel recommended a five day suspension because Capt. Waguespack did not appear to intentionally violate the NOPD policy.

Based on the evidence and testimony, the CSC concluded that Capt. Waguespack's statements to the reporter constituted an NOPD matter and that Capt. Waguespack's conduct violated Rule 6. The CSC stated, in relevant part:

> NOPD has carried its burden of showing the underlying conduct occurred. Capt. Waguespack provided information to the media about his and Dr. Minyard's conversations with the family of Joey Georgusis. Capt. Waguespack reviewed Joey Georgusis death in his role as head of the homicide division. His conversations with Georgusis and Dr. Minyard concerned official NOPD business. Therefore, the content of these conversations is a "matter" of NOPD. Captain Frank Young, who investigated the complaint against Capt. Waguespack[,] testified that Capt. Waguespack is a potential witness in court and that the bribe was offered because of Capt. Waguespack's position with NOPD. [] Capt. Waguespack was speaking on an official matter and should have referred Gordon [Russell] to the Public Information Office. []

> Capt. Waguespack's violation of the rule impaired the efficient operation of NOPD as the Public Information Office coordinates all external communications to the media for the purposes of accuracy and consistency. [] Capt. Waguespack's conversation with Russell and the resulting article, which Capt. Waguespack said was not accurate, undermined this goal. Also, as a senior captain, NOPD expects Capt. Waguespack to follow NOPD rules, so that his subordinates will follow this NOPD rules. []

> The discipline is commensurate with the infraction, as Deputy Superintendent Noel mitigated the penalty because of an absence of intent on the part of Capt. Waguespack to violate the rule.

(citations to the record omitted).

The CSC's reasoning provides a rational basis for concluding there was lawful cause for taking disciplinary action. While Capt. Waguespack's conversation with Russell involved events that occurred several years prior, the testimony shows that the actions of the NOPD in the review of Joey Georgusis's death was subject to ligation and extensive media coverage. Further, Capt. Waguespack admitted he was aware of the media attention and the civil suit at the time. He also admitted that he spoke with Russell without obtaining permission from the PIO. The testimony from the hearing also shows Capt. Waguespack was asked to look into Joey Georgusis's death and was the head of the homicide department at the time of the conversation with Georgusis. Additionally, as noted by the CSC, Capt. Young indicated that Capt. Waguespack was "potentially a witness in court" and was offered the money due to his role as an investigator in the NOPD.  Therefore, the conversations with Georgusis and Capt. Waguespack's subsequent statements to the press concern "any other matters of the Department" under Rule 6, and the CSC did not abuse its discretion in concluding that Capt. Waguespack violated NOPD policy.

Additionally, the record shows that Capt. Waguespack's actions impaired the efficient operation of the NOPD. The PIO coordinates communications with the press to ensure the information is accurate and consistent, and Capt. Waguespack admitted that the article in *The Advocate* was not accurate.

As such, the CSC's finding that Capt. Waguespack spoke with media without the proper authority about official NOPD business and that Capt.

Waguespack's actions impaired the efficiency of the NOPD's operation is not manifestly erroneous or clearly wrong.

As noted earlier, Capt. Waguespack also claims that Rule 6 is vague and overly broad. In support of his argument, he relies on *Bradford v. New Orleans Police Dept.*, 2004-0788 (La. App. 4 Cir. 11/23/04) 891 So.2d 9, which affirmed the CSC's decision to reverse the NOPD's disciplinary action to suspend the officer for one day for failing to submit a report for an "accident" and submit to a drug test. In *Bradford*, the officer was driving a police unit and while stopped at the traffic signal a pickup truck, rolled backward as the driver attempted to put the vehicle into gear and "touched the bumper" of the police vehicle. *Id*, p. 1, 891 So.2d at 10. After speaking with the other driver and observing that the incident did not result in property damage or personal injury, both parties left the scene of the accident. Later, the other driver made a report and when confronted with the report, the officer admitted to the incident and submitted to a drug test, which was negative. After an investigation was conducted, the NOPD issued a letter that the officer violated NOPD policy requiring that an officer report an accident to his supervisor and submit to a drug test.[3]

The CSC found that NOPD's use of the term "accident", which was not defined by the NOPD, was overly broad and contrary to the Civil Service Rules, which specifically define "accident" and "near miss" relative to substance abuse testing.[4] The CSC concluded that the touching of bumpers did not constitute an

_____

[3] NOPD Chapter 13.21 "relative to Substance Abuse Testing; Failure to Report an Accident" provided that employees shall be tested when "any employee of the New Orleans Police Department is involved in an accident as the operator of a police conveyance (automobile, motorcycle, bicycle, horse, boat, etc.) while on or off duty." *Bradford,* 2004-0788, p. 2, 891 So.2d at 11. Chapter 13.21 also "relative to Substance Abuse Testing; Failure to Notify a Supervisor of an Accident" stated that "[a]ccidents and/or injuries shall be reported immediately to the employee's immediate supervisor(s)." *Id*. at p. 3, 891 So.2d at 11.

"accident" or a "near miss" under the Civil Service Rules and that the officer was not required to report the incident and submit to an immediate substance abuse test. As a result, the CSC found that NOPD was without legal cause to discipline him. This Court affirmed.

However, *Bradford* is distinguishable from the instant case because unlike in *Bradford*, wherein the rule at issue conflicted with another Civil Service Rule, Capt. Waguespack has not indicated that Rule 6 conflicts with any other NOPD Rule or Civil Service Rule.

Rule 6 prohibits NOPD employees from providing statements about any departmental matter to the media without the appropriate authority. It states that "[e]mployees shall not … act as correspondents to a newspaper or periodical, release or divulge investigative information, or any other matters of the Department without official sanction or proper authority." Rule 6 thus adequately places Capt. Waguespack and other officers on notice of their duty to get permission before speaking to the press about NOPD affairs. Moreover, Capt. Waguespack contacted the PIO after Zurik requested an interview which shows that Rule 6 gave sufficient notice of his responsibly to obtain authorization before making statements to a reporter. Therefore, Capt. Waguespack's argument that the Rule is overly broad and vague lacks merit.

---

[4] Civil Service Rule V, Section 9.13 provided that all employees should participate in substance abuse screening procedure if involved in an on-the-job accident, sustains an on-the-job injury, or is associated with a "near-miss" on-the-job incident. *Bradford*, 2004-0788, pp. 6-7, 891 So. 2d at 13. For purposes of this Rule: the term "accident" referred to "any occurrence which requires treatment by qualified medical personnel, causes injury or fatality, produces damage to property or material, or interrupts and/or terminates scheduled work assignments." The term "near-miss" referred to "any incident which might have resulted in an 'accident' (as defined above) but for the intervention of some special action, circumstance or event, and which was caused to any degree by violations of safety rules or procedures, by careless or negligent conduct or by the failure to use prescribed personal protective equipment." *Id.* at p. 6, 891 So.2d at 13.

**Discipline Commensurate with the Offense**

As discussed above, the second factor that must be reviewed in determining whether an appointing authority properly imposed disciplinary action, is whether "the punishment imposed is commensurate with the offense." *See Harris v. Dep't of Fire*, 2008-0514, p. 11 (La. App. 4 Cir. 7/16/08), 990 So.2d 54, 62 (citing *Staehle v. Dep't. of Police,* 1998-0216, p. 3 (La. App. 4 Cir. 11/18/98), 723 So.2d 1031, 1033). "The discipline must have a rational basis to be commensurate with the dereliction or it is deemed arbitrary and capricious." *Meisch v. Dep't of Police*, 2012-0702, p. 11 (La. App. 4 Cir. 2/20/13), 110 So.3d 207, 214, (citing *Staehle*, 1998–0216, p. 3, 723 So.2d at 1032, 1033; *Walters v. Dep't of Police*, 454 So.2d 106, 114 (La. 1984)).

In reviewing whether punishment is commensurate with the infraction, this Court in *Poche v. Off. of Police Secondary Emp.*, 2018-0431, p. 8 (La. App. 4 Cir. 11/14/18), 318 So.3d 732, 738, explained:

> [W]e afford great deference to the CSC's ruling supporting the decision of the appointing authority. *See Serignet v. Dept. of Health*, [20]08-0469, p. 10 (La. App. 4 Cir. 5/20/09), 15 So.3d 1019, 1025. Neither the CSC nor a reviewing court should "second-guess" an appointing authority's decisions. *See Lange v. Orleans* Levee District, [20]10-0140, p. 17 (La. 11/30/10), 56 So.3d 925, 936.[ ] Moreover, neither the CSC nor the reviewing court may serve as a *de facto* pardon board. *Id*. "[S]ympathy is not a legal standard." *Id*.

*Id*. (quoting *Byrd v. Dep't of Police*, 2012-1040, p. 10 (La. App. 4 Cir. 2/6/13), 109 So.3d 973, 980).

The NOPD penalty matrix shows that Capt. Waguespack was given the lowest possible penalty for the violation and thus the discipline imposed is not arbitrary or capricious. Chapter 26.2.1 of the NOPD Operations Manual provides for the disciplinary matrix/penalty schedule, which "outlines the level of discipline

assigned to violations of either NOPD policies or Louisiana state law."[5] *Charles v. New Orleans Police Dep't*, 2019-0232, pp. 7-8 (La. App. 4 Cir. 9/16/20), 308 So.3d 750, 754-55, *writ denied*, 2020-01161 (La. 12/8/20), 306 So.3d 434 (citing *Cunningham v. New Orleans Police Dep't,* 2018-0095, p. 6 (La. App. 4 Cir. 10/10/18), 257 So.3d 801, 805). It provides that a violation of Rule 6, Paragraph 3 is a Level D offense and that the first offense for a Level D is "5-10-20/D." With regard to a first offense for a Level D violation, the NOPD disciplinary matrix indicates that the presumptive penalty is a ten day suspension; that a five day suspension is the minimum penalty; and that twenty days is the maximum.[6] Asst. Supt. Noel testified that Capt. Waguespack received a five day suspension, the lowest penalty possible, in lieu of the presumptive penalty, because Capt. Waguespack did not intend to violate NOPD policy. As such, the record is sufficient to show that the five day suspension is rationally based and commensurate to the dereliction. *See Charles*, 2019-0232, p. 13, 308 So.3d at 757 (finding the CSC did not act in arbitrary and capricious manner in finding that police sergeant was properly disciplined where the sergeant received a penalty on the lower end of the penalty range available under the NOPD penalty matrix). The

---

[5] As this Court in *Charles v. New Orleans Police Dep't*, 2019-0232, p 7, n. 6 (La. App. 4 Cir. 9/16/20), 308 So.3d 750, 754, *writ denied*, 2020-01161 (La. 12/8/20), 306 So.3d 434, acknowledged, this Court takes judicial notice of the NOPD Penalty Schedule, which is accessible in the public domain. *Id*. (citing *Mendoza v. Mendoza*, 2017-0070, p. 6 (La. App. 4 Cir. 6/6/18), 249 So.3d 67, 71). This information is was taken directly from the NOPD's Procedure Manual's Disciplinary Hearing and Penalty Schedule. *See* New Orleans Police Department Operations Manual, Chapter 26.2.1, Title: Disciplinary Matrix/Penalty Schedule, *http://nola.gov/getattachment/NOPD/Policies/Chapter-26-2-1-Disciplinary-Matrix-EFFECTIVE-3-18-18.pdf/* (last visited Nov. 21, 2022).

[6] The NOPD disciplinary matrix explains that the numbers represent the days of suspension and that "D" represents a demotion or dismissal if the offense is egregious. It states that the three numbers represent the minimum, the presumptive, and maximum penalties. It notes: "For example, '30-45-60/D' means a 45-day suspension is the presumptive penalty, a 30-day suspension is the minimum penalty, and the maximum is 60 days but may result in dismissal for an egregious offense." *Id*.

CDC's decision to maintain the five day suspension was not arbitrary or capricious.

## CONCLUSION

For the reasons set forth above, we affirm the decision of the CSC to deny Capt. Waguespack's appeal and uphold the five day suspension imposed by the NOPD.

**AFFIRMED**